# MORRISON, INDEPENDENT COUNSEL *v.* OLSON ET AL.

No. 87–1279.   Argued April 26, 1988—Decided June 29, 1988

656

Rehnquist, C. J., delivered the opinion of the Court, in which Brennan, White, Marshall, Blackmun, Stevens, and O'Connor, JJ., joined. Scalia, J., filed a dissenting opinion, *post*, p. 697. Kennedy, J., took no part in the consideration or decision of the case.

*Alexia Morrison*, appellant, argued the cause *pro se*. With her on the briefs were *Earl C. Dudley, Jr.*, and *Louis*

F. Claiborne. Michael Davidson argued the cause for the United States Senate as amicus curiae in support of appellant. With him on the brief were Ken U. Benjamin, Jr., and Morgan J. Frankel.

Thomas S. Martin argued the cause for appellees. With him on the brief for appellee Olson were Anthony C. Epstein, David E. Zerhusen, David W. DeBruin, and Carl S. Nadler. Brendan V. Sullivan, Jr., Barry S. Simon, Jacob A. Stein, and Robert F. Muse filed a brief for appellees Schmults et al. Solicitor General Fried argued the cause for the United States as amicus curiae in support of appellees. With him on the brief were Assistant Attorney General Bolton, Deputy Solicitors General Cohen and Bryson, Deputy Assistant Attorneys General Spears and Cynkar, Edwin S. Kneedler, Richard G. Taranto, Robert E. Kopp, and Douglas Letter.*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

This case presents us with a challenge to the independent counsel provisions of the Ethics in Government Act of 1978, 28 U. S. C. §§ 49, 591 et seq. (1982 ed., Supp. V). We hold

---

*Briefs of amici curiae urging reversal were filed for the American Bar Association by Robert MacCrate and Irvin B. Nathan; for Common Cause by Archibald Cox, Donald J. Simon, Paul A. Freund, and Philip B. Heymann; for the Center for Constitutional Rights by Morton Stavis, Michael Ratner, Frank Askin, and Daniel Pollitt; for Public Citizen by Eric R. Glitzenstein and Alan B. Morrison; for Burton D. Linne et al. by Edwin Vieira, Jr.; and for Lawrence E. Walsh by Laurence H. Tribe, Paul L. Friedman, and Guy Miller Struve.

Briefs of amici curiae urging affirmance were filed for Michael K. Deaver by Herbert J. Miller, Jr., and Randall J. Turk; and for Edward H. Levi et al. by David A. Strauss.

Briefs of amici curiae were filed for the Speaker and Leadership Group of the House of Representatives by Steven R. Ross, Charles Tiefer, and Michael L. Murray; for the American Federation of Labor and Congress of Industrial Organizations by Robert M. Weinberg, Michael H. Gottesman, and Laurence Gold; and for Whitney North Seymour, Jr., by Mr. Seymour, pro se, George F. Hritz, Benjamin R. Civiletti, and Ramsey Clark.

today that these provisions of the Act do not violate the Appointments Clause of the Constitution, Art. II, § 2, cl. 2, or the limitations of Article III, nor do they impermissibly interfere with the President's authority under Article II in violation of the constitutional principle of separation of powers.

## I

Briefly stated, Title VI of the Ethics in Government Act (Title VI or the Act), 28 U. S. C. §§ 591–599 (1982 ed., Supp. V),[1] allows for the appointment of an "independent counsel" to investigate and, if appropriate, prosecute certain high-ranking Government officials for violations of federal criminal laws.[2] The Act requires the Attorney General, upon receipt of information that he determines is "sufficient to constitute grounds to investigate whether any person [covered by the Act] may have violated any Federal criminal law," to conduct a preliminary investigation of the matter. When the Attor-

---

[1] The Act was first enacted by Congress in 1978, Pub. L. 95–521, 92 Stat. 1867, and has been twice reenacted, with amendments. See Pub. L. 97–409, 96 Stat. 2039; Pub. L. 100–191, 101 Stat. 1293. The current version of the statute states that, with certain exceptions, it shall "cease to be effective five years after the date of the enactment of the Independent Counsel Reauthorization Act of 1987." 28 U. S. C. § 599 (1982 ed., Supp. V).

[2] Under 28 U. S. C. § 591(a) (1982 ed., Supp. V), the statute applies to violations of "any Federal criminal law other than a violation classified as a Class B or C misdemeanor or an infraction." See also § 591(c) ("any Federal criminal law other than a violation classified as a Class B or C misdemeanor or an infraction"). Section 591(b) sets forth the individuals who may be the target of an investigation by the Attorney General, including the President and Vice President, Cabinet level officials, certain high-ranking officials in the Executive Office of the President and the Justice Department, the Director and Deputy Director of Central Intelligence, the Commissioner of Internal Revenue, and certain officials involved in the President's national political campaign. Pursuant to § 591(c), the Attorney General may also conduct a preliminary investigation of persons not named in § 591(b) if an investigation by the Attorney General or other Department of Justice official "may result in a personal, financial, or political conflict of interest."

ney General has completed this investigation, or 90 days has elapsed, he is required to report to a special court (the Special Division) created by the Act "for the purpose of appointing independent counsels." 28 U. S. C. § 49 (1982 ed., Supp. V).[3] If the Attorney General determines that "there are no reasonable grounds to believe that further investigation is warranted," then he must notify the Special Division of this result. In such a case, "the division of the court shall have no power to appoint an independent counsel." § 592(b)(1). If, however, the Attorney General has determined that there are "reasonable grounds to believe that further investigation or prosecution is warranted," then he "shall apply to the division of the court for the appointment of an independent counsel."[4] The Attorney General's application to the court "shall contain sufficient information to assist the [court] in selecting an independent counsel and in defining that independent counsel's prosecutorial jurisdiction." § 592(d). Upon receiving this application, the Special Division "shall appoint an appropriate independent counsel and shall define that independent counsel's prosecutorial jurisdiction." § 593(b).[5]

---

[3] The Special Division is a division of the United States Court of Appeals for the District of Columbia Circuit. 28 U. S. C. § 49 (1982 ed., Supp. V). The court consists of three circuit court judges or justices appointed by the Chief Justice of the United States. One of the judges must be a judge of the United States Court of Appeals for the District of Columbia Circuit, and no two of the judges may be named to the Special Division from a particular court. The judges are appointed for 2-year terms, with any vacancy being filled only for the remainder of the 2-year period. *Ibid.*

[4] The Act also requires the Attorney General to apply for the appointment of an independent counsel if 90 days elapse from the receipt of the information triggering the preliminary investigation without a determination by the Attorney General that there are no reasonable grounds to believe that further investigation or prosecution is warranted. § 592(c)(1). Pursuant to § 592(f), the Attorney General's decision to apply to the Special Division for the appointment of an independent counsel is not reviewable "in any court."

[5] Upon request of the Attorney General, in lieu of appointing an independent counsel the Special Division may "expand the prosecutorial juris-

With respect to all matters within the independent counsel's jurisdiction, the Act grants the counsel "full power and independent authority to exercise all investigative and prosecutorial functions and powers of the Department of Justice, the Attorney General, and any other officer or employee of the Department of Justice." § 594(a).[6] The functions of the independent counsel include conducting grand jury proceedings and other investigations, participating in civil and criminal court proceedings and litigation, and appealing any decision in any case in which the counsel participates in an official capacity. §§ 594(a)(1)–(3). Under § 594(a)(9), the counsel's powers include "initiating and conducting prosecutions in any court of competent jurisdiction, framing and signing indictments, filing informations, and handling all aspects of any case, in the name of the United States." The counsel may appoint employees, § 594(c), may request and obtain assistance from the Department of Justice, § 594(d), and may accept referral of matters from the Attorney General if the matter falls within the counsel's jurisdiction as defined by the Special Division, § 594(e). The Act also states that an independent counsel "shall, except where not possible, comply with the written or other established policies of the Department of Justice respecting enforcement of the criminal laws." § 594(f). In addition, whenever a matter has been referred to an independent counsel under the Act, the Attorney Gen-

---

diction of an independent counsel." § 593(c). Section 593 also authorizes the Special Division to fill vacancies arising because of the death, resignation, or removal of an independent counsel. § 593(e). The court, in addition, is empowered to grant limited extensions of time for the Attorney General's preliminary investigation, § 592(a)(3), and to award attorney's fees to unindicted individuals who were the subject of an investigation by an independent counsel. § 593(f) (as amended by Pub. L. 101–191, 101 Stat. 1293).

[6]The Attorney General, however, retains "direction or control as to those matters that specifically require the Attorney General's personal action under section 2516 of title 18." § 594(a).

eral and the Justice Department are required to suspend all investigations and proceedings regarding the matter. § 597(a). An independent counsel has "full authority to dismiss matters within [his or her] prosecutorial jurisdiction without conducting an investigation or at any subsequent time before prosecution, if to do so would be consistent" with Department of Justice policy. § 594(g).[7]

Two statutory provisions govern the length of an independent counsel's tenure in office. The first defines the procedure for removing an independent counsel. Section 596(a)(1) provides:

> "An independent counsel appointed under this chapter may be removed from office, other than by impeachment and conviction, only by the personal action of the Attorney General and only for good cause, physical disability, mental incapacity, or any other condition that substantially impairs the performance of such independent counsel's duties."

If an independent counsel is removed pursuant to this section, the Attorney General is required to submit a report to both the Special Division and the Judiciary Committees of the Senate and the House "specifying the facts found and the ultimate grounds for such removal." § 596(a)(2). Under the current version of the Act, an independent counsel can obtain judicial review of the Attorney General's action by filing a civil action in the United States District Court for the District of Columbia. Members of the Special Division "may not hear or determine any such civil action or any appeal of a de-

---

[7] The 1987 amendments to the Act specify that the Department of Justice "shall pay all costs relating to the establishment and operation of any office of independent counsel." The Attorney General must report to Congress regarding the amount expended on investigations and prosecutions by independent counsel. § 594(d)(2). In addition, the independent counsel must also file a report of major expenses with the Special Division every six months. § 594(h)(1)(A).

cision in any such civil action." The reviewing court is authorized to grant reinstatement or "other appropriate relief." § 596(a)(3).[8]

The other provision governing the tenure of the independent counsel defines the procedures for "terminating" the counsel's office. Under § 596(b)(1), the office of an independent counsel terminates when he or she notifies the Attorney General that he or she has completed or substantially completed any investigations or prosecutions undertaken pursuant to the Act. In addition, the Special Division, acting either on its own or on the suggestion of the Attorney General, may terminate the office of an independent counsel at any time if it finds that "the investigation of all matters within the prosecutorial jurisdiction of such independent counsel . . . have been completed or so substantially completed that it would be appropriate for the Department of Justice to complete such investigations and prosecutions." § 596(b)(2).[9]

Finally, the Act provides for congressional oversight of the activities of independent counsel. An independent counsel may from time to time send Congress statements or reports on his or her activities. § 595(a)(2). The "appropriate committees of the Congress" are given oversight jurisdiction in regard to the official conduct of an independent counsel, and the counsel is required by the Act to cooperate with Congress in the exercise of this jurisdiction. § 595(a)(1). The counsel is required to inform the House of Representatives of

---

[8] Under the Act as originally enacted, an independent counsel who was removed could obtain judicial review of the Attorney General's decision in a civil action commenced before the Special Division. If the removal was "based on error of law or fact," the court could order "reinstatement or other appropriate relief." 28 U. S. C. § 596(a)(3).

[9] Sections 596(b)(1)(B) and 596(b)(2) also require that the independent counsel have filed a final report with the Special Division in compliance with § 594(h)(1)(B).

"substantial and credible information which [the counsel] receives . . . that may constitute grounds for an impeachment." § 595(c). In addition, the Act gives certain congressional committee members the power to "request in writing that the Attorney General apply for the appointment of an independent counsel." § 592(g)(1). The Attorney General is required to respond to this request within a specified time but is not required to accede to the request. § 592(g)(2).

The proceedings in this case provide an example of how the Act works in practice. In 1982, two Subcommittees of the House of Representatives issued subpoenas directing the Environmental Protection Agency (EPA) to produce certain documents relating to the efforts of the EPA and the Land and Natural Resources Division of the Justice Department to enforce the "Superfund Law."[10] At that time, appellee Olson was the Assistant Attorney General for the Office of Legal Counsel (OLC), appellee Schmults was Deputy Attorney General, and appellee Dinkins was the Assistant Attorney General for the Land and Natural Resources Division. Acting on the advice of the Justice Department, the President ordered the Administrator of EPA to invoke executive privilege to withhold certain of the documents on the ground that they contained "enforcement sensitive information." The Administrator obeyed this order and withheld the documents. In response, the House voted to hold the Administrator in contempt, after which the Administrator and the United States together filed a lawsuit against the House. The conflict abated in March 1983, when the administration agreed to give the House Subcommittees limited access to the documents.

The following year, the House Judiciary Committee began an investigation into the Justice Department's role in the controversy over the EPA documents. During this investigation, appellee Olson testified before a House Subcommittee

---

[10] Comprehensive Environmental Response, Compensation, and Liability Act of 1980, Pub. L. 96–510, 94 Stat. 2767, 42 U. S. C. § 9601 et seq.

on March 10, 1983. Both before and after that testimony, the Department complied with several Committee requests to produce certain documents. Other documents were at first withheld, although these documents were eventually disclosed by the Department after the Committee learned of their existence. In 1985, the majority members of the Judiciary Committee published a lengthy report on the Committee's investigation. Report on Investigation of the Role of the Department of Justice in the Withholding of Environmental Protection Agency Documents from Congress in 1982–83, H. R. Rep. No. 99–435 (1985). The report not only criticized various officials in the Department of Justice for their role in the EPA executive privilege dispute, but it also suggested that appellee Olson had given false and misleading testimony to the Subcommittee on March 10, 1983, and that appellees Schmults and Dinkins had wrongfully withheld certain documents from the Committee, thus obstructing the Committee's investigation. The Chairman of the Judiciary Committee forwarded a copy of the report to the Attorney General with a request, pursuant to 28 U. S. C. § 592(c), that he seek the appointment of an independent counsel to investigate the allegations against Olson, Schmults, and Dinkins.

The Attorney General directed the Public Integrity Section of the Criminal Division to conduct a preliminary investigation. The Section's report concluded that the appointment of an independent counsel was warranted to investigate the Committee's allegations with respect to all three appellees. After consulting with other Department officials, however, the Attorney General chose to apply to the Special Division for the appointment of an independent counsel solely with respect to appellee Olson.[11] The Attorney General accordingly

---

[11] The Attorney General concluded that appellees Schmults and Dinkins lacked the requisite "criminal intent" to obstruct the Committee's investigation. See Report of Attorney General Pursuant to 28 U. S. C. § 592(c)(1) Regarding Allegations Against Department of Justice Officials

requested appointment of an independent counsel to investigate whether Olson's March 10, 1983, testimony "regarding the completeness of [OLC's] response to the Judiciary Committee's request for OLC documents, and regarding his knowledge of EPA's willingness to turn over certain disputed documents to Congress, violated 18 U. S. C. § 1505, § 1001, or any other provision of federal criminal law." Attorney General Report, at 2–3. The Attorney General also requested that the independent counsel have authority to investigate "any other matter related to that allegation." *Id.*, at 11.

On April 23, 1986, the Special Division appointed James C. McKay as independent counsel to investigate "whether the testimony of . . . Olson and his revision of such testimony on March 10, 1983, violated either 18 U. S. C. § 1505 or § 1001, or any other provision of federal law." The court also ordered that the independent counsel

> "shall have jurisdiction to investigate any other allegation of evidence of violation of any Federal criminal law by Theodore Olson developed during investigations, by the Independent Counsel, referred to above, and connected with or arising out of that investigation, and Independent Counsel shall have jurisdiction to prosecute for any such violation." Order, Div. No. 86–1 (CADC Special Division, April 23, 1986).

McKay later resigned as independent counsel, and on May 29, 1986, the Division appointed appellant Morrison as his replacement, with the same jurisdiction.

In January 1987, appellant asked the Attorney General pursuant to § 594(e) to refer to her as "related matters" the Committee's allegations against appellees Schmults and Dinkins. The Attorney General refused to refer the matters, concluding that his decision not to request the appointment of

---

in United States House Judiciary Committee Report 22, 45 (Apr. 10, 1986), filed in No. 86–1 (CADC) (Attorney General Report).

an independent counsel in regard to those matters was final under § 592(b)(1). Appellant then asked the Special Division to order that the matters be referred to her under § 594(e). On April 2, 1987, the Division ruled that the Attorney General's decision not to seek appointment of an independent counsel with respect to Schmults and Dinkins was final and unreviewable under § 592(b)(1), and that therefore the court had no authority to make the requested referral. *In re Olson*, 260 U. S. App. D. C. 168, 818 F. 2d 34. The court ruled, however, that its original grant of jurisdiction to appellant was broad enough to permit inquiry into whether Olson may have conspired with others, including Schmults and Dinkins, to obstruct the Committee's investigation. *Id.*, at 181–182, 818 F. 2d, at 47–48.

Following this ruling, in May and June 1987, appellant caused a grand jury to issue and serve subpoenas *ad testificandum* and *duces tecum* on appellees. All three appellees moved to quash the subpoenas, claiming, among other things, that the independent counsel provisions of the Act were unconstitutional and that appellant accordingly had no authority to proceed. On July 20, 1987, the District Court upheld the constitutionality of the Act and denied the motions to quash. *In re Sealed Case*, 665 F. Supp. 56 (DC). The court subsequently ordered that appellees be held in contempt pursuant to 28 U. S. C. § 1826(a) for continuing to refuse to comply with the subpoenas. See App. to Juris. Statement 140a, 143a, 146a. The court stayed the effect of its contempt orders pending expedited appeal.

A divided Court of Appeals reversed. *In re Sealed Case*, 267 U. S. App. D. C. 178, 838 F. 2d 476 (1988). The majority ruled first that an independent counsel is not an "inferior Officer" of the United States for purposes of the Appointments Clause. Accordingly, the court found the Act invalid because it does not provide for the independent counsel to be nominated by the President and confirmed by the Senate, as the Clause requires for "principal" officers. The court then

went on to consider several alternative grounds for its conclusion that the statute was unconstitutional. In the majority's view, the Act also violates the Appointments Clause insofar as it empowers a court of law to appoint an "inferior" officer who performs core executive functions; the Act's delegation of various powers to the Special Division violates the limitations of Article III; the Act's restrictions on the Attorney General's power to remove an independent counsel violate the separation of powers; and finally, the Act interferes with the Executive Branch's prerogative to "take care that the Laws be faithfully executed," Art. II, § 3. The dissenting judge was of the view that the Act was constitutional. 267 U. S. App. D. C., at 238, 838 F. 2d, at 536. Appellant then sought review by this Court, and we noted probable jurisdiction. 484 U. S. 1058 (1988). We now reverse.

## II

Before we get to the merits, we first must deal with appellant's contention that the constitutional issues addressed by the Court of Appeals cannot be reviewed on this appeal from the District Court's contempt judgment. Appellant relies on *Blair* v. *United States*, 250 U. S. 273 (1919), in which this Court limited rather sharply the issues that may be raised by an individual who has been subpoenaed as a grand jury witness and has been held in contempt for failure to comply with the subpoena. On the facts of this case, however, we find it unnecessary to consider whether *Blair* has since been narrowed by our more recent decisions, as appellees contend and the Court of Appeals found in another related case, *In re Sealed Case*, 264 U. S. App. D. C. 125, 827 F. 2d 776 (1987). Appellant herself admits that she failed to object to the District Court's consideration of the merits of appellees' constitutional claims, and as a result, the Court of Appeals ruled that she had waived her opportunity to contend on appeal that review of those claims was barred by *Blair*. We see no reason why the Court of Appeals was not entitled to conclude

that the failure of appellant to object on this ground in the District Court was a sufficient reason for refusing to consider it, and we likewise decline to consider it. Appellant's contention is not "jurisdictional" in the sense that it cannot be waived by failure to raise it at the proper time and place. It is not the sort of claim which would defeat jurisdiction in the District Court by showing that an Article III "Case" or "Controversy" is lacking. Appellees are subject to the burden of complying with the grand jury subpoena as a result of the District Court's contempt order, there is a legitimate adversaïial relationship between the parties, and the courts possess the power to redress or resolve the current controversy. See *Bender* v. *Williamsport Area School District*, 475 U. S. 534, 541–543 (1986). We therefore turn to consider the merits of appellees' constitutional claims.

### III

The Appointments Clause of Article II reads as follows:

> "[The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U. S. Const., Art. II, § 2, cl. 2.

The parties do not dispute that "[t]he Constitution for purposes of appointment . . . divides all its officers into two classes." *United States* v. *Germaine*, 99 U. S. 508, 509 (1879). As we stated in *Buckley* v. *Valeo*, 424 U. S. 1, 132 (1976): "Principal officers are selected by the President with the advice and consent of the Senate. Inferior officers Congress may allow to be appointed by the President alone, by the heads of departments, or by the Judiciary." The initial

question is, accordingly, whether appellant is an "inferior" or a "principal" officer.[12] If she is the latter, as the Court of Appeals concluded, then the Act is in violation of the Appointments Clause.

The line between "inferior" and "principal" officers is one that is far from clear, and the Framers provided little guidance into where it should be drawn. See, e. g., 2 J. Story, Commentaries on the Constitution § 1536, pp. 397–398 (3d ed. 1858) ("In the practical course of the government there does not seem to have been any exact line drawn, who are and who are not to be deemed *inferior* officers, in the sense of the constitution, whose appointment does not necessarily require the concurrence of the senate"). We need not attempt here to decide exactly where the line falls between the two types of officers, because in our view appellant clearly falls on the "inferior officer" side of that line. Several factors lead to this conclusion.

First, appellant is subject to removal by a higher Executive Branch official. Although appellant may not be "subordinate" to the Attorney General (and the President) insofar as she possesses a degree of independent discretion to exercise the powers delegated to her under the Act, the fact that she can be removed by the Attorney General indicates that she is to some degree "inferior" in rank and authority. Second, appellant is empowered by the Act to perform only certain, limited duties. An independent counsel's role is restricted primarily to investigation and, if appropriate, prosecution for certain federal crimes. Admittedly, the Act delegates to appellant "full power and independent authority to exercise all investigative and prosecutorial functions and powers of the Department of Justice," § 594(a), but this grant of authority does not include any authority to formulate policy for the Government or the Executive Branch, nor does it give appellant any administrative duties outside of those nec·

---

[12] It is clear that appellant is an "officer" of the United States, not an "employee." See *Buckley*, 424 U. S., at 126, and n. 162.

essary to operate her office. The Act specifically provides that in policy matters appellant is to comply to the extent possible with the policies of the Department. § 594(f).

Third, appellant's office is limited in jurisdiction. Not only is the Act itself restricted in applicability to certain federal officials suspected of certain serious federal crimes, but an independent counsel can only act within the scope of the jurisdiction that has been granted by the Special Division pursuant to a request by the Attorney General. Finally, appellant's office is limited in tenure. There is concededly no time limit on the appointment of a particular counsel. Nonetheless, the office of independent counsel is "temporary" in the sense that an independent counsel is appointed essentially to accomplish a single task, and when that task is over the office is terminated, either by the counsel herself or by action of the Special Division. Unlike other prosecutors, appellant has no ongoing responsibilities that extend beyond the accomplishment of the mission that she was appointed for and authorized by the Special Division to undertake. In our view, these factors relating to the "ideas of tenure, duration . . . and duties" of the independent counsel, *Germaine, supra,* at 511, are sufficient to establish that appellant is an "inferior" officer in the constitutional sense.

This conclusion is consistent with our few previous decisions that considered the question whether a particular Government official is a "principal" or an "inferior" officer. In *United States* v. *Eaton,* 169 U. S. 331 (1898), for example, we approved Department of State regulations that allowed executive officials to appoint a "vice-consul" during the temporary absence of the consul, terming the "vice-consul" a "subordinate officer" notwithstanding the Appointment Clause's specific reference to "Consuls" as principal officers. As we stated: "Because the subordinate officer is charged with the performance of the duty of the superior for a limited time and under special and temporary conditions he is not thereby transformed into the superior and permanent offi-

cial." *Id.*, at 343. In *Ex parte Siebold*, 100 U. S. 371 (1880), the Court found that federal "supervisor[s] of elections," who were charged with various duties involving oversight of local congressional elections, see *id.*, at 379–380, were inferior officers for purposes of the Clause. In *Go-Bart Importing Co.* v. *United States*, 282 U. S. 344, 352–353 (1931), we held that "United States commissioners are inferior officers." *Id.*, at 352. These commissioners had various judicial and prosecutorial powers, including the power to arrest and imprison for trial, to issue warrants, and to institute prosecutions under "laws relating to the elective franchise and civil rights." *Id.*, at 353, n. 2. All of this is consistent with our reference in *United States* v. *Nixon*, 418 U. S. 683, 694, 696 (1974), to the office of Watergate Special Prosecutor—whose authority was similar to that of appellant, see *id.*, at 694, n. 8—as a "subordinate officer."

This does not, however, end our inquiry under the Appointments Clause. Appellees argue that even if appellant is an "inferior" officer, the Clause does not empower Congress to place the power to appoint such an officer outside the Executive Branch. They contend that the Clause does not contemplate congressional authorization of "interbranch appointments," in which an officer of one branch is appointed by officers of another branch. The relevant language of the Appointments Clause is worth repeating. It reads: " . . . but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the courts of Law, or in the Heads of Departments." On its face, the language of this "excepting clause" admits of no limitation on interbranch appointments. Indeed, the inclusion of "as they think proper" seems clearly to give Congress significant discretion to determine whether it is "proper" to vest the appointment of, for example, executive officials in the "courts of Law." We recognized as much in one of our few decisions in this area, *Ex parte Siebold, supra*, where we stated:

"It is no doubt usual and proper to vest the appointment of inferior officers in that department of the government, executive or judicial, or in that particular executive department to which the duties of such officers appertain. But there is no absolute requirement to this effect in the Constitution; and, if there were, it would be difficult in many cases to determine to which department an office properly belonged. . . .

"But as the Constitution stands, the selection of the appointing power, as between the functionaries named, is a matter resting in the discretion of Congress. And, looking at the subject in a practical light, it is perhaps better that it should rest there, than that the country should be harassed by the endless controversies to which a more specific direction on this subject might have given rise." *Id.*, at 397–398.

Our only decision to suggest otherwise, *Ex parte Hennen*, 13 Pet. 230 (1839), from which the first sentence in the above quotation from *Siebold* was derived, was discussed in *Siebold* and distinguished as "not intended to define the constitutional power of Congress in this regard, but rather to express the law or rule by which it should be governed." 100 U. S., at 398. Outside of these two cases, there is very little, if any, express discussion of the propriety of interbranch appointments in our decisions, and we see no reason now to depart from the holding of *Siebold* that such appointments are not proscribed by the excepting clause.

We also note that the history of the Clause provides no support for appellees' position. Throughout most of the process of drafting the Constitution, the Convention concentrated on the problem of who should have the authority to appoint judges. At the suggestion of James Madison, the Convention adopted a proposal that the Senate should have this authority, 1 Records of the Federal Convention of 1787, pp. 232–233 (M. Farrand ed. 1966), and several attempts to transfer the appointment power to the President were re-

jected.  See 2 *id.*, at 42–44, 80–83.  The August 6, 1787, draft of the Constitution reported by the Committee of Detail retained Senate appointment of Supreme Court Judges, provided also for Senate appointment of ambassadors, and vested in the President the authority to "appoint officers in all cases not otherwise provided for by this Constitution." *Id.*, at 183, 185.  This scheme was maintained until September 4, when the Committee of Eleven reported its suggestions to the Convention.  This Committee suggested that the Constitution be amended to state that the President "shall nominate and by and with the advice and consent of the Senate shall appoint ambassadors, and other public Ministers, Judges of the Supreme Court, and all other Officers of the [United States], whose appointments are not otherwise herein provided for." *Id.*, at 498–499.  After the addition of "Consuls" to the list, the Committee's proposal was adopted, *id.*, at 539, and was subsequently reported to the Convention by the Committee of Style.  See *id.*, at 599.  It was at this point, on September 15, that Gouverneur Morris moved to add the Excepting Clause to Art. II, § 2.  *Id.*, at 627.  The one comment made on this motion was by Madison, who felt that the Clause did not go far enough in that it did not allow Congress to vest appointment powers in "Superior Officers below Heads of Departments."  The first vote on Morris' motion ended in a tie.  It was then put forward a second time, with the urging that "some such provision [was] too necessary, to be omitted."  This time the proposal was adopted.  *Id.*, at 627–628.  As this discussion shows, there was little or no debate on the question whether the Clause empowers Congress to provide for interbranch appointments, and there is nothing to suggest that the Framers intended to prevent Congress from having that power.

We do not mean to say that Congress' power to provide for interbranch appointments of "inferior officers" is unlimited. In addition to separation-of-powers concerns, which would arise if such provisions for appointment had the potential to

impair the constitutional functions assigned to one of the branches, *Siebold* itself suggested that Congress' decision to vest the appointment power in the courts would be improper if there was some "incongruity" between the functions normally performed by the courts and the performance of their duty to appoint. 100 U. S., at 398 ("[T]he duty to appoint inferior officers, when required thereto by law, is a constitutional duty of the courts; and in the present case there is no such incongruity in the duty required as to excuse the courts from its performance, or to render their acts void"). In this case, however, we do not think it impermissible for Congress to vest the power to appoint independent counsel in a specially created federal court. We thus disagree with the Court of Appeals' conclusion that there is an inherent incongruity about a court having the power to appoint prosecutorial officers.[13] We have recognized that courts may appoint private attorneys to act as prosecutor for judicial contempt judgments. See *Young* v. *United States ex rel. Vuitton et Fils S. A.*, 481 U. S. 787 (1987). In *Go-Bart Importing Co.* v. *United States*, 282 U. S. 344 (1931), we approved court appointment of United States commissioners, who exercised certain limited prosecutorial powers. *Id.*, at 353, n. 2. In *Siebold*, as well, we indicated that judicial appointment of federal marshals, who are "executive officer[s]," would not be inappropriate. Lower courts have also upheld interim judicial appointments of United States Attorneys, see *United States* v. *Solomon*, 216 F. Supp. 835 (SDNY 1963), and Congress itself has vested the power to make these interim appointments in the district courts, see 28

---

[13] Indeed, in light of judicial experience with prosecutors in criminal cases, it could be said that courts are especially well qualified to appoint prosecutors. This is not a case in which judges are given power to appoint an officer in an area in which they have no special knowledge or expertise, as in, for example, a statute authorizing the courts to appoint officials in the Department of Agriculture or the Federal Energy Regulatory Commission.

U. S. C. § 546(d) (1982 ed., Supp. V).[14]   Congress, of course, was concerned when it created the office of independent counsel with the conflicts of interest that could arise in situations when the Executive Branch is called upon to investigate its own high-ranking officers.   If it were to remove the appointing authority from the Executive Branch, the most logical place to put it was in the Judicial Branch.   In the light of the Act's provision making the judges of the Special Division ineligible to participate in any matters relating to an independent counsel they have appointed, 28 U. S. C. § 49(f) (1982 ed., Supp. V), we do not think that appointment of the independent counsel by the court runs afoul of the constitutional limitation on "incongruous" interbranch appointments.

## IV

Appellees next contend that the powers vested in the Special Division by the Act conflict with Article III of the Constitution.   We have long recognized that by the express provision of Article III, the judicial power of the United States is limited to "Cases" and "Controversies."   See *Muskrat* v. *United States*, 219 U. S. 346, 356 (1911).   As a general rule, we have broadly stated that "executive or administrative duties of a nonjudicial nature may not be imposed on judges holding office under Art. III of the Constitution."   *Buckley*, 424 U. S., at 123 (citing *United States* v. *Ferreira*, 13 How. 40 (1852); *Hayburn's Case*, 2 Dall. 409 (1792)).[15]   The pur-

---

[14] We note also the longstanding judicial practice of appointing defense attorneys for individuals who are unable to afford representation, see 18 U. S. C. § 3006A(b) (1982 ed., Supp. V), notwithstanding the possibility that the appointed attorney may appear in court before the judge who appointed him.

[15] In several cases, the Court has indicated that Article III "judicial Power" does not extend to duties that are more properly performed by the Executive Branch.   *Hayburn's Case*, for example, involved a statute empowering federal and state courts to set pensions for disabled veterans of the Revolutionary War.   See Act of Mar. 23, 1792, ch. 11, 1 Stat. 243. The Act "undertook to devolve upon the Circuit Court of the United States the duty of examining proofs, of determining what amount of the monthly

pose of this limitation is to help ensure the independence of the Judicial Branch and to prevent the Judiciary from encroaching into areas reserved for the other branches. See *United States Parole Comm'n* v. *Geraghty*, 445 U. S. 388, 396 (1980). With this in mind, we address in turn the various duties given to the Special Division by the Act.

Most importantly, the Act vests in the Special Division the power to choose who will serve as independent counsel and the power to define his or her jurisdiction. § 593(b). Clearly, once it is accepted that the Appointments Clause gives Congress the power to vest the appointment of officials such as the independent counsel in the "courts of Law," there can be no Article III objection to the Special Division's exercise of that power, as the power itself derives from the Appointments Clause, a source of authority for judicial action

---

pay would be equivalent to the disability ascertained, and to certify the same to the Secretary of War." *Muskrat*, 219 U. S., at 352. The court's decision was to be reported to the Secretary of War, who had the discretion to either adopt or reject the court's findings. *Ibid.* This Court did not reach the constitutional issue in *Hayburn's Case*, but the opinions of several Circuit Courts were reported in the margins of the Court's decision in that case, and have since been taken to reflect a proper understanding of the role of the Judiciary under the Constitution. See, *e. g.*, *Ferreira*, 13 How., at 50–51.

In *Ferreira*, Congress passed a statute authorizing a federal court in Florida to hear and adjudicate claims for losses for which the United States was to be held responsible under the 1819 treaty with Spain that ceded Florida to the United States. *Id.*, at 45. As in *Hayburn's Case*, the results of the court proceeding were to be reported to an executive official, the Secretary of the Treasury, who would make the final determination whether to pay the claims. 13 How., at 47. The Court recognized that the powers conferred on the judge by the statute were "judicial in their nature," in that they involved "judgment and discretion." *Id.*, at 48. Nonetheless, they were not "judicial . . . in the sense in which judicial power is granted by the Constitution to the courts of the United States." *Ibid.* Because the District Court's decision in *Ferreira* was not an exercise of Article III judicial power, the Court ruled that it had no jurisdiction to hear the appeal. *Id.*, at 51–52.

that is independent of Article III.[16] Appellees contend, how-ever, that the Division's Appointments Clause powers do not encompass the power to define the independent counsel's jurisdiction. We disagree. In our view, Congress' power under the Clause to vest the "Appointment" of inferior offi-cers in the courts may, in certain circumstances, allow Con-gress to give the courts some discretion in defining the nature and scope of the appointed official's authority. Par-ticularly when, as here, Congress creates a temporary "of-fice" the nature and duties of which will by necessity vary with the factual circumstances giving rise to the need for an appointment in the first place, it may vest the power to de-fine the scope of the office in the court as an incident to the appointment of the officer pursuant to the Appointments Clause. This said, we do not think that Congress may give the Division *unlimited* discretion to determine the independ-ent counsel's jurisdiction. In order for the Division's defini-tion of the counsel's jurisdiction to be truly "incidental" to its power to appoint, the jurisdiction that the court decides upon must be demonstrably related to the factual circumstances that gave rise to the Attorney General's investigation and re-quest for the appointment of the independent counsel in the particular case.[17]

---

[16] We do not think that judicial exercise of the power to appoint, *per se,* is in any way inconsistent as a functional matter with the courts' exercise of their Article III powers. We note that courts have long participated in the appointment of court officials such as United States commissioners or magistrates, see *Go-Bart Importing Co.* v. *United States,* 282 U. S. 344 (1931); 28 U. S. C. § 631(a), without disruption of normal judicial functions. And certainly the Court in *Ex parte Hennen,* 13 Pet. 230 (1839), deemed it entirely appropriate that a court should have the authority to appoint its own clerk.

[17] Our conclusion that the power to define the counsel's jurisdiction is in-cidental to the power to appoint also applies to the Division's authority to expand the jurisdiction of the counsel upon request of the Attorney Gen-eral under § 593(c)(2).

The Act also vests in the Special Division various powers and duties in relation to the independent counsel that, because they do not involve appointing the counsel or defining his or her jurisdiction, cannot be said to derive from the Division's Appointments Clause authority. These duties include granting extensions for the Attorney General's preliminary investigation, § 592(a)(3); receiving the report of the Attorney General at the conclusion of his preliminary investigation, §§ 592(b)(1), 593(c)(2)(B); referring matters to the counsel upon request, § 594(e) [18]; receiving reports from the counsel regarding expenses incurred, § 594(h)(1)(A); receiving a report from the Attorney General following the removal of an independent counsel, § 596(a)(2); granting attorney's fees upon request to individuals who were investigated but not indicted by an independent counsel, § 593(f); receiving a final report from the counsel, § 594(h)(1)(B); deciding whether to release the counsel's final report to Congress or the public and determining whether any protective orders should be issued, § 594(h)(2); and terminating an independent counsel when his or her task is completed, § 596(b)(2).

Leaving aside for the moment the Division's power to terminate an independent counsel, we do not think that Article III absolutely prevents Congress from vesting these other miscellaneous powers in the Special Division pursuant to the Act. As we observed above, one purpose of the broad prohibition upon the courts' exercise of "executive or administrative duties of a nonjudicial nature," *Buckley*, 424 U. S., at 123, is to maintain the separation between the Judiciary and the other branches of the Federal Government by ensuring that judges do not encroach upon executive or legislative authority or undertake tasks that are more properly accom-

---

[18] In our view, this provision does not empower the court to expand the original scope of the counsel's jurisdiction; that may be done only upon request of the Attorney General pursuant to § 593(c)(2). At most, § 594(e) authorizes the court simply to refer matters that are "relate[d] to the independent counsel's prosecutorial jurisdiction" as already defined.

plished by those branches. In this case, the miscellaneous powers described above do not impermissibly trespass upon the authority of the Executive Branch. Some of these allegedly "supervisory" powers conferred on the court are passive: the Division merely "receives" reports from the counsel or the Attorney General, it is not entitled to act on them or to specifically approve or disapprove of their contents. Other provisions of the Act do require the court to exercise some judgment and discretion,[19] but the powers granted by these provisions are themselves essentially ministerial. The Act simply does not give the Division the power to "supervise" the independent counsel in the exercise of his or her investigative or prosecutorial authority. And, the functions that the Special Division is empowered to perform are not inherently "Executive"; indeed, they are directly analogous to functions that federal judges perform in other contexts, such as deciding whether to allow disclosure of matters occurring before a grand jury, see Fed. Rule Crim. Proc. 6(e), deciding to extend a grand jury investigation, Rule 6(g), or awarding attorney's fees, see, e. g., 42 U. S. C. § 1988.[20]

---

[19] The Special Division must determine whether the Attorney General has shown "good cause" for his or her request for an extension of the time limit on his or her preliminary investigation, § 592(a)(3); the court must decide whether and to what extent it should release to the public the counsel's final report or the Attorney General's removal report, §§ 596(a)(2), (b)(2); and the court may consider the propriety of a request for attorney's fees, § 593(f).

[20] By way of comparison, we also note that federal courts and judges have long performed a variety of functions that, like the functions involved here, do not necessarily or directly involve adversarial proceedings within a trial or appellate court. For example, federal courts have traditionally supervised grand juries and assisted in their "investigative function" by, if necessary, compelling the testimony of witnesses. See *Brown* v. *United States*, 359 U. S. 41, 49 (1959). Federal courts also participate in the issuance of search warrants, see Fed. Rule Crim. Proc. 41, and review applications for wiretaps, see 18 U. S. C. §§ 2516, 2518 (1982 ed. and Supp. IV), both of which may require a court to consider the nature and scope of criminal investigations on the basis of evidence or affidavits submitted in an *ex*

We are more doubtful about the Special Division's power to terminate the office of the independent counsel pursuant to § 596(b)(2). As appellees suggest, the power to terminate, especially when exercised by the Division on its own motion, is "administrative" to the extent that it requires the Special Division to monitor the progress of proceedings of the independent counsel and come to a decision as to whether the counsel's job is "completed." § 596(b)(2). It also is not a power that could be considered typically "judicial," as it has few analogues among the court's more traditional powers. Nonetheless, we do not, as did the Court of Appeals, view this provision as a significant judicial encroachment upon executive power or upon the prosecutorial discretion of the independent counsel.

We think that the Court of Appeals overstated the matter when it described the power to terminate as a "broadsword and . . . rapier" that enables the court to "control the pace and depth of the independent counsel's activities." 267 U. S. App. D. C., at 217, 838 F. 2d, at 515. The provision has not been tested in practice, and we do not mean to say that an adventurous special court could not reasonably construe the provision as did the Court of Appeals; but it is the duty of federal courts to construe a statute in order to save it from constitutional infirmities, see, e. g., Commodity Futures Trading Comm'n v. Schor, 478 U. S. 833, 841 (1986), and to that end we think a narrow construction is appropriate here. The termination provisions of the Act do not give the Special Division anything approaching the power to remove the counsel while an investigation or court proceeding is still underway—this power is vested solely in the Attorney General. As we see it, "termination" may occur only when the duties of

---

parte proceeding. In Young v. United States ex rel. Vuitton et Fils S. A., 481 U. S. 787, 793–802 (1987), we recognized that federal courts possess inherent authority to initiate contempt proceedings for disobedience to their orders, and this authority necessarily includes the ability to appoint a private attorney to prosecute the contempt.

the counsel are truly "completed" or "so substantially completed" that there remains no need for any continuing action by the independent counsel.[21]   It is basically a device for removing from the public payroll an independent counsel who has served his or her purpose, but is unwilling to acknowledge the fact.   So construed, the Special Division's power to terminate does not pose a sufficient threat of judicial intrusion into matters that are more properly within the Executive's authority to require that the Act be invalidated as inconsistent with Article III.

Nor do we believe, as appellees contend, that the Special Division's exercise of the various powers specifically granted to it under the Act poses any threat to the "impartial and independent federal adjudication of claims within the judicial power of the United States." *Commodity Futures Trading Comm'n v. Schor, supra,* at 850.   We reach this conclusion for two reasons.   First, the Act as it currently stands gives the Special Division itself no power to review any of the actions of the independent counsel or any of the actions of the Attorney General with regard to the counsel.   Accordingly, there is no risk of partisan or biased adjudication of claims regarding the independent counsel by that court.   Second, the Act prevents members of the Special Division from participating in "*any* judicial proceeding concerning a matter which involves such independent counsel while such independent counsel is serving in that office or which involves the exercise of such independent counsel's official duties, regard-

---

[21] As the dissenting opinion noted below, the termination provision was "intended to serve only as a measure of last resort."   See *In re Sealed Case,* 267 U. S. App. D. C. 178, 224, n. 13, 838 F. 2d 476, 522, n. 13 (1988). The Senate Report on the provision states:

"This paragraph provides for the unlikely situation where a special prosecutor may try to remain as special prosecutor after his responsibilities under this chapter are completed. . . . The drastic remedy of terminating the office of special prosecutor without the consent of the special prosecutor should obviously be executed with caution." S. Rep. No. 95–170, p. 75 (1977).

less of whether such independent counsel is still serving in that office." 28 U. S. C. § 49(f) (1982 ed., Supp. V) (emphasis added); see also § 596(a)(3) (preventing members of the Special Division from participating in review of the Attorney General's decision to remove an independent counsel). We think both the special court and its judges are sufficiently isolated by these statutory provisions from the review of the activities of the independent counsel so as to avoid any taint of the independence of the Judiciary such as would render the Act invalid under Article III.

We emphasize, nevertheless, that the Special Division has *no* authority to take any action or undertake any duties that are not specifically authorized by the Act. The gradual expansion of the authority of the Special Division might in another context be a bureaucratic success story, but it would be one that would have serious constitutional ramifications. The record in other cases involving independent counsel indicate that the Special Division has at times given advisory opinions or issued orders that are not directly authorized by the Act. Two examples of this were cited by the Court of Appeals, which noted that the Special Division issued "orders" that ostensibly exempted the independent counsel from conflict-of-interest laws. See 267 U. S. App. D. C., at 216, and n. 60, 838 F. 2d, at 514, and n. 60 (citing *In re Deaver*, No. 86–2 (CADC Special Division, July 2, 1986), and *In re Olson*, No. 86–1 (CADC Special Division, June 18, 1986)). In another case, the Division reportedly ordered that a counsel postpone an investigation into certain allegations until the completion of related state criminal proceedings. See H. R. Rep. Conf. Rep. No. 100–452, p. 26 (1987). The propriety of the Special Division's actions in these instances is not before us as such, but we nonetheless think it appropriate to point out not only that there is no authorization for such actions in the Act itself, but that the Division's exercise of unauthorized

powers risks the transgression of the constitutional limitations of Article III that we have just discussed.[22]

## V

We now turn to consider whether the Act is invalid under the constitutional principle of separation of powers. Two related issues must be addressed: The first is whether the provision of the Act restricting the Attorney General's power to remove the independent counsel to only those instances in which he can show "good cause," taken by itself, impermissibly interferes with the President's exercise of his constitutionally appointed functions. The second is whether, taken as a whole, the Act violates the separation of powers by reducing the President's ability to control the prosecutorial powers wielded by the independent counsel.

## A

Two Terms ago we had occasion to consider whether it was consistent with the separation of powers for Congress to pass a statute that authorized a Government official who is removable only by Congress to participate in what we found to be "executive powers." *Bowsher* v. *Synar*, 478 U. S. 714, 730 (1986). We held in *Bowsher* that "Congress cannot reserve

[22] We see no impropriety in the Special Division's actions with regard to its response to appellant's request for referral of additional matters in this case. See *In re Olson*, 260 U. S. App. D. C. 168, 818 F. 2d 34 (Special Division 1987). The Division has statutory authority to respond to appellant's request pursuant to § 594(e), and it was only proper that it first consider whether it could exercise its statutory authority without running afoul of the Constitution. As to the Division's alleged "reinterpretation" of its original grant of jurisdiction, the power to "reinterpret" or clarify the original grant may be seen as incidental to the court's referral power. After all, in order to decide whether to refer a matter to the counsel, the court must be able to determine whether the matter falls within the scope of the original grant. See n. 18, *supra*. We express no view on the merits of the Division's interpretation of the original grant or of its ruling in regard its power to refer matters that the Attorney General has previously refused to refer.

for itself the power of removal of an officer charged with the execution of the laws except by impeachment." *Id.*, at 726. A primary antecedent for this ruling was our 1926 decision in *Myers* v. *United States*, 272 U. S. 52. *Myers* had considered the propriety of a federal statute by which certain postmasters of the United States could be removed by the President only "by and with the advice and consent of the Senate." There too, Congress' attempt to involve itself in the removal of an executive official was found to be sufficient grounds to render the statute invalid. As we observed in *Bowsher*, the essence of the decision in *Myers* was the judgment that the Constitution prevents Congress from "draw[ing] to itself . . . the power to remove or the right to participate in the exercise of that power. To do this would be to go beyond the words and implications of the [Appointments Clause] and to infringe the constitutional principle of the separation of governmental powers." *Myers, supra*, at 161.

Unlike both *Bowsher* and *Myers*, this case does not involve an attempt by Congress itself to gain a role in the removal of executive officials other than its established powers of impeachment and conviction. The Act instead puts the removal power squarely in the hands of the Executive Branch; an independent counsel may be removed from office, "only by the personal action of the Attorney General, and only for good cause." § 596(a)(1).[23] There is no requirement of congressional approval of the Attorney General's removal decision, though the decision is subject to judicial review. § 596(a)(3). In our view, the removal provisions of the Act make this case more analogous to *Humphrey's Executor* v. *United States*, 295 U. S. 602 (1935), and *Wiener* v. *United States*, 357 U. S. 349 (1958), than to *Myers* or *Bowsher*.

---

[23] As noted, an independent counsel may also be removed through impeachment and conviction. In addition, the Attorney General may remove a counsel for "physical disability, mental incapacity, or any other condition that substantially impairs the performance" of his or her duties. § 596(a)(1).

In *Humphrey's Executor*, the issue was whether a statute restricting the President's power to remove the Commissioners of the Federal Trade Commission (FTC) only for "inefficiency, neglect of duty, or malfeasance in office" was consistent with the Constitution. 295 U. S., at 619. We stated that whether Congress can "condition the [President's power of removal] by fixing a definite term and precluding a removal except for cause, will depend upon the character of the office." *Id.*, at 631. Contrary to the implication of some dicta in *Myers*,[24] the President's power to remove Government officials simply was not "all-inclusive in respect of civil officers with the exception of the judiciary provided for by the Constitution." 295 U. S., at 629. At least in regard to "quasi-legislative" and "quasi-judicial" agencies such as the FTC,[25] "[t]he authority of Congress, in creating [such] agencies, to require them to act in discharge of their duties independently of executive control . . . includes, as an appropriate incident, power to fix the period during which they shall continue in office, and to forbid their removal except for cause in the meantime." *Ibid.* In *Humphrey's Executor*, we found it "plain" that the Constitution did not give the President "illimitable power of removal" over the officers of independent agencies. *Ibid.* Were the President to have

---

[24] The Court expressly disapproved of any statements in *Myers* that "are out of harmony" with the views expressed in *Humphrey's Executor.* 295 U. S., at 626. We recognized that the only issue actually decided in *Myers* was that "the President had power to remove a postmaster of the first class, without the advice and consent of the Senate as required by act of Congress." 295 U. S., at 626.

[25] See *id.*, at 627–628. We described the FTC as "an administrative body created by Congress to carry into effect legislative policies embodied in the statute in accordance with the legislative standard therein prescribed, and to perform other specified duties as a legislative or as a judicial aid." Such an agency was not "an arm or an eye of the executive," and the commissioners were intended to perform their duties "without executive leave and . . . free from executive control." *Id.*, at 628. As we put it at the time, the powers of the FTC were not "purely" executive, but were "quasi-legislative or quasi-judicial." *Ibid.*

the power to remove FTC Commissioners at will, the "coercive influence" of the removal power would "threate[n] the independence of [the] commission." *Id.*, at 630.

Similarly, in *Wiener* we considered whether the President had unfettered discretion to remove a member of the War Claims Commission, which had been established by Congress in the War Claims Act of 1948, 62 Stat. 1240. The Commission's function was to receive and adjudicate certain claims for compensation from those who had suffered personal injury or property damage at the hands of the enemy during World War II. Commissioners were appointed by the President, with the advice and consent of the Senate, but the statute made no provision for the removal of officers, perhaps because the Commission itself was to have a limited existence. As in *Humphrey's Executor*, however, the Commissioners were entrusted by Congress with adjudicatory powers that were to be exercised free from executive control. In this context, "Congress did not wish to have hang over the Commission the Damocles' sword of removal by the President for no reason other than that he preferred to have on that Commission men of his own choosing." 357 U. S., at 356. Accordingly, we rejected the President's attempt to remove a Commissioner "merely because he wanted his own appointees on [the] Commission," stating that "no such power is given to the President directly by the Constitution, and none is impliedly conferred upon him by statute." *Ibid.*

Appellees contend that *Humphrey's Executor* and *Wiener* are distinguishable from this case because they did not involve officials who performed a "core executive function." They argue that our decision in *Humphrey's Executor* rests on a distinction between "purely executive" officials and officials who exercise "quasi-legislative" and "quasi-judicial" powers. In their view, when a "purely executive" official is involved, the governing precedent is *Myers*, not *Humphrey's Executor*. See *Humphrey's Executor*, *supra*, at 628. And, under *Myers*, the President must have absolute discretion to

discharge "purely" executive officials at will. See *Myers*, 272 U. S., at 132–134.[26]

We undoubtedly did rely on the terms "quasi-legislative" and "quasi-judicial" to distinguish the officials involved in *Humphrey's Executor* and *Wiener* from those in *Myers*, but our present considered view is that the determination of whether the Constitution allows Congress to impose a "good cause"-type restriction on the President's power to remove an official cannot be made to turn on whether or not that official is classified as "purely executive."[27] The analysis contained in our removal cases is designed not to define rigid categories of those officials who may or may not be removed at will by the President,[28] but to ensure that Congress does

---

[26] This same argument was raised by the Solicitor General in *Bowsher* v. *Synar*, 478 U. S. 714 (1986), although as JUSTICE WHITE noted in dissent in that case, the argument was clearly not accepted by the Court at that time. *Id.*, at 738–739, and nn. 1–3.

[27] Indeed, this Court has never held that the Constitution prevents Congress from imposing limitations on the President's power to remove *all* executive officials simply because they wield "executive" power. *Myers* itself expressly distinguished cases in which Congress had chosen to vest the appointment of "inferior" executive officials in the head of a department. See 272 U. S., at 161–163, 164. In such a situation, we saw no specific constitutional impediment to congressionally imposed restrictions on the President's removal powers. See also *United States* v. *Perkins*, 116 U. S. 483, 485 (1886) (" 'The constitutional authority in Congress to thus vest the appointment [of inferior officers in the heads of departments] implies authority to limit, restrict, and regulate the removal by such laws as Congress may enact in relation to the officers so appointed'") (quoting the Court of Claims' decision in the case).

[28] The difficulty of defining such categories of "executive" or "quasi-legislative" officials is illustrated by a comparison of our decisions in cases such as *Humphrey's Executor*, *Buckley* v. *Valeo*, 424 U. S. 1, 140–141 (1976), and *Bowsher*, *supra*, at 732–734. In *Buckley*, we indicated that the functions of the Federal Election Commission are "administrative," and "more legislative and judicial in nature," and are "of kinds usually performed by independent regulatory agencies or by some department in the Executive Branch under the direction of an Act of Congress." 424 U. S., at 140–141. In *Bowsher*, we found that the functions of the Comptroller General were "executive" in nature, in that he was required to "exercise judgment concerning facts that affect the application of the Act," and he

not interfere with the President's exercise of the "executive power" and his constitutionally appointed duty to "take care that the laws be faithfully executed" under Article II. *Myers* was undoubtedly correct in its holding, and in its broader suggestion that there are some "purely executive" officials who must be removable by the President at will if he is to be able to accomplish his constitutional role.[29]   See 272 U. S., at 132–134.   But as the Court noted in *Wiener:*

> "The assumption was short-lived that the *Myers* case recognized the President's inherent constitutional power to remove officials no matter what the relation of the executive to the discharge of their duties and no matter what restrictions Congress may have imposed regarding the nature of their tenure."   357 U. S., at 352.

At the other end of the spectrum from *Myers*, the characterization of the agencies in *Humphrey's Executor* and *Wie-*

---

must "interpret the provisions of the Act to determine precisely what budgetary calculations are required."   478 U. S., at 733.   Compare this with the description of the FTC's powers in *Humphrey's Executor*, which we stated "occupie[d] no place in the executive department": "The [FTC] is an administrative body created by Congress to carry into effect legislative policies embodied in the statute in accordance with the legislative standard therein prescribed, and to perform other specified duties as a legislative or as a judicial aid."   295 U. S., at 628.   As JUSTICE WHITE noted in his dissent in *Bowsher*, it is hard to dispute that the powers of the FTC at the time of *Humphrey's Executor* would at the present time be considered "executive," at least to some degree.   See 478 U. S., at 761, n. 3.

[29] The dissent says that the language of Article II vesting the executive power of the United States in the President requires that every officer of the United States exercising any part of that power must serve at the pleasure of the President and be removable by him at will.   *Post*, at 705. This rigid demarcation—a demarcation incapable of being altered by law in the slightest degree, and applicable to tens of thousands of holders of offices neither known nor foreseen by the Framers—depends upon an extrapolation from general constitutional language which we think is more than the text will bear.   It is also contrary to our holding in *United States* v. *Perkins, supra*, decided more than a century ago.

*ner* as "quasi-legislative" or "quasi-judicial" in large part reflected our judgment that it was not essential to the President's proper execution of his Article II powers that these agencies be headed up by individuals who were removable at will.[30] We do not mean to suggest that an analysis of the functions served by the officials at issue is irrelevant. But the real question is whether the removal restrictions are of such a nature that they impede the President's ability to perform his constitutional duty, and the functions of the officials in question must be analyzed in that light.

Considering for the moment the "good cause" removal provision in isolation from the other parts of the Act at issue in this case, we cannot say that the imposition of a "good cause" standard for removal by itself unduly trammels on executive authority. There is no real dispute that the functions performed by the independent counsel are "executive" in the sense that they are law enforcement functions that typically have been undertaken by officials within the Executive Branch. As we noted above, however, the independent counsel is an inferior officer under the Appointments Clause, with limited jurisdiction and tenure and lacking policymaking or significant administrative authority. Although the counsel exercises no small amount of discretion and judgment in deciding how to carry out his or her duties under the Act, we simply do not see how the President's need to control the exercise of that discretion is so central to the functioning of the Executive Branch as to require as a matter of consti-

---

[30] The terms also may be used to describe the circumstances in which Congress might be more inclined to find that a degree of independence from the Executive, such as that afforded by a "good cause" removal standard, is necessary to the proper functioning of the agency or official. It is not difficult to imagine situations in which Congress might desire that an official performing "quasi-judicial" functions, for example, would be free of executive or political control.

tutional law that the counsel be terminable at will by the President.[31]

Nor do we think that the "good cause" removal provision at issue here impermissibly burdens the President's power to control or supervise the independent counsel, as an executive official, in the execution of his or her duties under the Act. This is not a case in which the power to remove an executive official has been completely stripped from the President, thus providing no means for the President to ensure the "faithful execution" of the laws. Rather, because the independent counsel may be terminated for "good cause," the Executive, through the Attorney General, retains ample authority to assure that the counsel is competently performing his or her statutory responsibilities in a manner that comports with the provisions of the Act.[32] Although we need not decide in this case exactly what is encompassed within the term "good cause" under the Act, the legislative history of the removal provision also makes clear that the Attorney General may remove an independent counsel for "misconduct." See H. R. Conf. Rep. No. 100–452, p. 37 (1987). Here, as with the provision of the Act conferring the appointment authority of

---

[31] We note by way of comparison that various federal agencies whose officers are covered by "good cause" removal restrictions exercise civil enforcement powers that are analogous to the prosecutorial powers wielded by an independent counsel. See, e. g., 15 U. S. C. § 45(m) (giving the FTC the authority to bring civil actions to recover civil penalties for the violations of rules respecting unfair competition); 15 U. S. C. §§ 2061, 2071, 2076(b)(7)(A) (giving the Consumer Product Safety Commission the authority to obtain injunctions and apply for seizure of hazardous products).

[32] Indeed, during the hearings on the 1982 amendments to the Act, a Justice Department official testified that the "good cause" standard contained in the amendments "would make the special prosecutor no more independent than officers of the many so-called independent agencies in the executive branch." Ethics in Government Act Amendments of 1982, Hearing before the Subcommittee on Oversight of Government Management of the Senate Committee on Governmental Affairs, 97th Cong., 2d Sess., 7 (1981) (Associate Attorney General Giuliani).

the independent counsel on the special court, the congressional determination to limit the removal power of the Attorney General was essential, in the view of Congress, to establish the necessary independence of the office. We do not think that this limitation as it presently stands sufficiently deprives the President of control over the independent counsel to interfere impermissibly with his constitutional obligation to ensure the faithful execution of the laws.[33]

## B

The final question to be addressed is whether the Act, taken as a whole, violates the principle of separation of powers by unduly interfering with the role of the Executive Branch. Time and again we have reaffirmed the importance in our constitutional scheme of the separation of governmental powers into the three coordinate branches. See, e. g., *Bowsher* v. *Synar*, 478 U. S., at 725 (citing *Humphrey's Executor*, 295 U. S., at 629–630). As we stated in *Buckley* v. *Valeo*, 424 U. S. 1 (1976), the system of separated powers and checks and balances established in the Constitution was regarded by the Framers as "a self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other." *Id.*, at 122. We have not hesitated to invalidate provisions of law which violate this principle. See *id.*, at 123. On the other hand, we have never held that the Constitution requires that the three

---

[33] We see no constitutional problem in the fact that the Act provides for judicial review of the removal decision. § 596(a)(3). The purpose of such review is to ensure that an independent counsel is removed only in accordance with the will of Congress as expressed in the Act. The possibility of judicial review does not inject the Judicial Branch into the removal decision, nor does it, by itself, put any additional burden on the President's exercise of executive authority. Indeed, we note that the legislative history of the most recent amendment to the Act indicates that the scope of review to be exercised by the courts under § 596(a)(3) is to be "the standards established by existing case law on the removal of [other] officials" who are subject to "good cause" removal. H. R. Conf. Rep. No. 100–452, p. 37 (1987).

branches of Government "operate with absolute independence." *United States* v. *Nixon*, 418 U. S., at 707; see also *Nixon* v. *Administrator of General Services*, 433 U. S. 425, 442 (1977) (citing James Madison in The Federalist No. 47, and Joseph Story in 1 Commentaries on the Constitution § 525 (M. Bigelow, 5th ed. 1905)). In the often-quoted words of Justice Jackson:

> "While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity." *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 635 (1952) (concurring opinion).

We observe first that this case does not involve an attempt by Congress to increase its own powers at the expense of the Executive Branch. Cf. *Commodity Futures Trading Comm'n* v. *Schor*, 478 U. S., at 856. Unlike some of our previous cases, most recently *Bowsher* v. *Synar*, this case simply does not pose a "dange[r] of congressional usurpation of Executive Branch functions." 478 U. S., at 727; see also *INS* v. *Chadha*, 462 U. S. 919, 958 (1983). Indeed, with the exception of the power of impeachment—which applies to all officers of the United States—Congress retained for itself no powers of control or supervision over an independent counsel. The Act does empower certain Members of Congress to request the Attorney General to apply for the appointment of an independent counsel, but the Attorney General has no duty to comply with the request, although he must respond within a certain time limit. § 592(g). Other than that, Congress' role under the Act is limited to receiving reports or other information and oversight of the independent counsel's activities, § 595(a), functions that we have recognized generally as being incidental to the legislative function of Congress. See *McGrain* v. *Daugherty*, 273 U. S. 135, 174 (1927).

Similarly, we do not think that the Act works any *judicial* usurpation of properly executive functions.  As should be apparent from our discussion of the Appointments Clause above, the power to appoint inferior officers such as independent counsel is not in itself an "executive" function in the constitutional sense, at least when Congress has exercised its power to vest the appointment of an inferior office in the "courts of Law."  We note nonetheless that under the Act the Special Division has no power to appoint an independent counsel *sua sponte;* it may only do so upon the specific request of the Attorney General, and the courts are specifically prevented from reviewing the Attorney General's decision not to seek appointment, § 592(f).  In addition, once the court has appointed a counsel and defined his or her jurisdiction, it has no power to supervise or control the activities of the counsel.  As we pointed out in our discussion of the Special Division in relation to Article III, the various powers delegated by the statute to the Division are not supervisory or administrative, nor are they functions that the Constitution requires be performed by officials within the Executive Branch.  The Act does give a federal court the power to review the Attorney General's decision to remove an independent counsel, but in our view this is a function that is well within the traditional power of the Judiciary.

Finally, we do not think that the Act "impermissibly undermine[s]" the powers of the Executive Branch, *Schor, supra,* at 856, or "disrupts the proper balance between the coordinate branches [by] prevent[ing] the Executive Branch from accomplishing its constitutionally assigned functions," *Nixon* v. *Administrator of General Services, supra,* at 443. It is undeniable that the Act reduces the amount of control or supervision that the Attorney General and, through him, the President exercises over the investigation and prosecution of a certain class of alleged criminal activity.  The Attorney General is. not allowed to appoint the individual of his choice; he does not determine the counsel's jurisdiction; and his

power to remove a counsel is limited.[34]   Nonetheless, the Act does give the Attorney General several means of supervising or controlling the prosecutorial powers that may be wielded by an independent counsel.   Most importantly, the Attorney General retains the power to remove the counsel for "good cause," a power that we have already concluded provides the Executive with substantial ability to ensure that the laws are "faithfully executed" by an independent counsel.   No independent counsel may be appointed without a specific request by the Attorney General, and the Attorney General's decision not to request appointment if he finds "no reasonable grounds to believe that further investigation is warranted" is committed to his unreviewable discretion.   The Act thus gives the Executive a degree of control over the power to initiate an investigation by the independent counsel.   In addition, the jurisdiction of the independent counsel is defined with reference to the facts submitted by the Attorney General, and once a counsel is appointed, the Act requires that the counsel abide by Justice Department policy unless it is not "possible" to do so.   Notwithstanding the fact that the counsel is to some degree "independent" and free from executive supervision to a greater extent than other federal prosecutors, in our view these features of the Act give the Executive Branch sufficient control over the independent counsel to ensure that the President is able to perform his constitutionally assigned duties.

## VI

In sum, we conclude today that it does not violate the Appointments Clause for Congress to vest the appointment of independent counsel in the Special Division; that the powers exercised by the Special Division under the Act do not violate

---

[34] With these provisions, the degree of control exercised by the Executive Branch over an independent counsel is clearly diminished in relation to that exercised over other prosecutors, such as the United States Attorneys, who are appointed by the President and subject to termination at will.

Article III; and that the Act does not violate the separation-of-powers principle by impermissibly interfering with the functions of the Executive Branch. The decision of the Court of Appeals is therefore

*Reversed.*

JUSTICE KENNEDY took no part in the consideration or decision of this case.

JUSTICE SCALIA, dissenting.

It is the proud boast of our democracy that we have "a government of laws and not of men." Many Americans are familiar with that phrase; not many know its derivation. It comes from Part the First, Article XXX, of the Massachusetts Constitution of 1780, which reads in full as follows:

> "In the government of this Commonwealth, the legislative department shall never exercise the executive and judicial powers, or either of them: The executive shall never exercise the legislative and judicial powers, or either of them: The judicial shall never exercise the legislative and executive powers, or either of them: to the end it may be a government of laws and not of men."

The Framers of the Federal Constitution similarly viewed the principle of separation of powers as the absolutely central guarantee of a just Government. In No. 47 of The Federalist, Madison wrote that "[n]o political truth is certainly of greater intrinsic value, or is stamped with the authority of more enlightened patrons of liberty." The Federalist No. 47, p. 301 (C. Rossiter ed. 1961) (hereinafter Federalist). Without a secure structure of separated powers, our Bill of Rights would be worthless, as are the bills of rights of many nations of the world that have adopted, or even improved upon, the mere words of ours.

The principle of separation of powers is expressed in our Constitution in the first section of each of the first three Articles. Article I, § 1, provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United

States, which shall consist of a Senate and House of Representatives." Article III, § 1, provides that "[t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." And the provision at issue here, Art. II, § 1, cl. 1, provides that "[t]he executive Power shall be vested in a President of the United States of America."

But just as the mere words of a Bill of Rights are not self-effectuating, the Framers recognized "[t]he insufficiency of a mere parchment delineation of the boundaries" to achieve the separation of powers. Federalist No. 73, p. 442 (A. Hamilton). "[T]he great security," wrote Madison, "against a gradual concentration of the several powers in the same department consists in giving to those who administer each department the necessary constitutional means and personal motives to resist encroachments of the others. The provision for defense must in this, as in all other cases, be made commensurate to the danger of attack." Federalist No. 51, pp. 321–322. Madison continued:

> "But it is not possible to give to each department an equal power of self-defense. In republican government, the legislative authority necessarily predominates. The remedy for this inconveniency is to divide the legislature into different branches; and to render them, by different modes of election and different principles of action, as little connected with each other as the nature of their common functions and their common dependence on the society will admit. . . . As the weight of the legislative authority requires that it should be thus divided, the weakness of the executive may require, on the other hand, that it should be fortified." *Id.*, at 322–323.

The major "fortification" provided, of course, was the veto power. But in addition to providing fortification, the Founders conspicuously and very consciously declined to sap the Executive's strength in the same way they had weakened

the Legislature: by dividing the executive power. Proposals to have multiple executives, or a council of advisers with separate authority were rejected. See 1 M. Farrand, Records of the Federal Convention of 1787, pp. 66, 71–74, 88, 91–92 (rev. ed. 1966); 2 *id.*, at 335–337, 533, 537, 542. Thus, while "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate *and* House of Representatives," U. S. Const., Art. I, § 1 (emphasis added), "[t]he executive Power shall be vested in *a President of the United States*," Art. II, § 1, cl. 1 (emphasis added).

That is what this suit is about. Power. The allocation of power among Congress, the President, and the courts in such fashion as to preserve the equilibrium the Constitution sought to establish—so that "a gradual concentration of the several powers in the same department," Federalist No. 51, p. 321 (J. Madison), can effectively be resisted. Frequently an issue of this sort will come before the Court clad, so to speak, in sheep's clothing: the potential of the asserted principle to effect important change in the equilibrium of power is not immediately evident, and must be discerned by a careful and perceptive analysis. But this wolf comes as a wolf.

I

The present case began when the Legislative and Executive Branches became "embroiled in a dispute concerning the scope of the congressional investigatory power," *United States* v. *House of Representatives of United States*, 556 F. Supp. 150, 152 (DC 1983), which—as is often the case with such interbranch conflicts—became quite acrimonious. In the course of oversight hearings into the administration of the Superfund by the Environmental Protection Agency (EPA), two Subcommittees of the House of Representatives requested and then subpoenaed numerous internal EPA documents. The President responded by personally directing the EPA Administrator not to turn over certain of the docu-

ments, see Memorandum of November 30, 1982, from President Reagan for the Administrator, Environmental Protection Agency, reprinted in H. R. Rep. No. 99–435, pp. 1166–1167 (1985), and by having the Attorney General notify the congressional Subcommittees of this assertion of executive privilege, see Letters of November 30, 1982, from Attorney General William French Smith to Hon. John D. Dingell and Hon. Elliott H. Levitas, reprinted, *id.*, at 1168–1177. In his decision to assert executive privilege, the President was counseled by appellee Olson, who was then Assistant Attorney General of the Department of Justice for the Office of Legal Counsel, a post that has traditionally had responsibility for providing legal advice to the President (subject to approval of the Attorney General). The House's response was to pass a resolution citing the EPA Administrator, who had possession of the documents, for contempt. Contempt of Congress is a criminal offense. See 2 U. S. C. § 192. The United States Attorney, however, a member of the Executive Branch, initially took no steps to prosecute the contempt citation. Instead, the Executive Branch sought the immediate assistance of the Third Branch by filing a civil action asking the District Court to declare that the EPA Administrator had acted lawfully in withholding the documents under a claim of executive privilege. See *ibid.* The District Court declined (in my view correctly) to get involved in the controversy, and urged the other two branches to try "[c]ompromise and cooperation, rather than confrontation." 556 F. Supp., at 153. After further haggling, the two branches eventually reached an agreement giving the House Subcommittees limited access to the contested documents.

Congress did not, however, leave things there. Certain Members of the House remained angered by the confrontation, particularly by the role played by the Department of Justice. Specifically, the Judiciary Committee remained disturbed by the possibility that the Department had persuaded the President to assert executive privilege despite reservations by the

EPA; that the Department had "deliberately and unnecessarily precipitated a constitutional confrontation with Congress"; that the Department had not properly reviewed and selected the documents as to which executive privilege was asserted; that the Department had directed the United States Attorney not to present the contempt certification involving the EPA Administrator to a grand jury for prosecution; that the Department had made the decision to sue the House of Representatives; and that the Department had not adequately advised and represented the President, the EPA, and the EPA Administrator. H. R. Rep. No. 99–435, p. 3 (1985) (describing unresolved "questions" that were the basis of the Judiciary Committee's investigation). Accordingly, staff counsel of the House Judiciary Committee were commissioned (apparently without the knowledge of many of the Committee's members, see *id.*, at 731) to investigate the Justice Department's role in the controversy. That investigation lasted 2½ years, and produced a 3,000-page report issued by the Committee over the vigorous dissent of all but one of its minority-party members. That report, which among other charges questioned the truthfulness of certain statements made by Assistant Attorney General Olson during testimony in front of the Committee during the early stages of its investigation, was sent to the Attorney General along with a formal request that he appoint an independent counsel to investigate Mr. Olson and others.

As a general matter, the Act before us here requires the Attorney General to apply for the appointment of an independent counsel within 90 days after receiving a request to do so, unless he determines within that period that "there are no reasonable grounds to believe that further investigation or prosecution is warranted." 28 U. S. C. § 592(b)(1). As a practical matter, it would be surprising if the Attorney General had any choice (assuming this statute is constitutional) but to seek appointment of an independent counsel to pursue the charges against the principal object of the congressional

request, Mr. Olson. Merely the political consequences (to him and the President) of seeming to break the law by refusing to do so would have been substantial. How could it not be, the public would ask, that a 3,000-page indictment drawn by our representatives over 2½ years does not even establish "reasonable grounds to believe" that further investigation or prosecution is warranted with respect to at least the principal alleged culprit? But the Act establishes more than just practical compulsion. Although the Court's opinion asserts that the Attorney General had "no duty to comply with the [congressional] request," *ante,* at 694, that is not entirely accurate. He *had* a duty to comply unless he could conclude that there were *"no reasonable grounds to believe,"* not that prosecution was warranted, but merely that *"further investigation"* was warranted, 28 U. S. C. § 592(b)(1) (1982 ed., Supp. V) (emphasis added), after a 90-day investigation in which he was prohibited from using such routine investigative techniques as grand juries, plea bargaining, grants of immunity, or even subpoenas, see § 592(a)(2). The Court also makes much of the fact that "the courts are specifically prevented from reviewing the Attorney General's decision not to seek appointment, § 592(f)." *Ante,* at 695. Yes,[1] but *Congress* is not prevented from reviewing it. The context of this statute is acrid with the smell of threatened impeachment. Where, as here, a request for appointment of an inde-

---

[1] I agree with the Court on this point, but not because of the section of the statute that it cites, § 592(f). What that provides is that "[t]he Attorney General's determination . . . *to apply to the division of the court for the appointment of an independent counsel shall not be reviewable in any court."* Quite obviously, the determination to apply is not the same as the determination not to apply. In other contexts, we have sternly avoided "construing" a statute to mean what it plainly does not say, merely in order to avoid constitutional problems. See *Commodity Futures Trading Comm'n* v. *Schor,* 478 U. S. 833, 841 (1986). In my view, however, the Attorney General's decision not to refer would in any event be nonreviewable as the exercise of prosecutorial discretion. See *Heckler* v. *Chaney,* 470 U. S. 821 (1985).

pendent counsel has come from the Judiciary Committee of either House of Congress, the Attorney General must, if he decides not to seek appointment, explain to that Committee why. See also 28 U. S. C. § 595(c) (1982 ed., Supp. V) (independent counsel must report to the House of Representatives information "that may constitute grounds for an impeachment").

Thus, by the application of this statute in the present case, Congress has effectively compelled a criminal investigation of a high-level appointee of the President in connection with his actions arising out of a bitter power dispute between the President and the Legislative Branch. Mr. Olson may or may not be guilty of a crime; we do not know. But we do know that the investigation of him has been commenced, not necessarily because the President or his authorized subordinates believe it is in the interest of the United States, in the sense that it warrants the diversion of resources from other efforts, and is worth the cost in money and in possible damage to other governmental interests; and not even, leaving aside those normally considered factors, because the President or his authorized subordinates necessarily believe that an investigation is likely to unearth a violation worth prosecuting; but only because the Attorney General cannot affirm, as Congress demands, that there are *no reasonable grounds to believe* that further investigation is warranted. The decisions regarding the scope of that further investigation, its duration, and, finally, whether or not prosecution should ensue, are likewise beyond the control of the President and his subordinates.

## II

If to describe this case is not to decide it, the concept of a government of separate and coordinate powers no longer has meaning. The Court devotes most of its attention to such relatively technical details as the Appointments Clause and the removal power, addressing briefly and only at the end of its opinion the separation of powers. As my prologue sug-

gests, I think that has it backwards. Our opinions are full of the recognition that it is the principle of separation of powers, and the inseparable corollary that each department's "defense must . . . be made commensurate to the danger of attack," Federalist No. 51, p. 322 (J. Madison), which gives comprehensible content to the Appointments Clause, and determines the appropriate scope of the removal power. Thus, while I will subsequently discuss why our appointments and removal jurisprudence does not support today's holding, I begin with a consideration of the fountainhead of that jurisprudence, the separation and equilibration of powers.

First, however, I think it well to call to mind an important and unusual premise that underlies our deliberations, a premise not expressly contradicted by the Court's opinion, but in my view not faithfully observed. It is rare in a case dealing, as this one does, with the constitutionality of a statute passed by the Congress of the United States, not to find anywhere in the Court's opinion the usual, almost formulary caution that we owe great deference to Congress' view that what it has done is constitutional, see, *e. g.*, *Rostker* v. *Goldberg*, 453 U. S. 57, 64 (1981); *Fullilove* v. *Klutznick*, 448 U. S. 448, 472 (1980) (opinion of Burger, C. J.); *Columbia Broadcasting System, Inc.* v. *Democratic National Committee*, 412 U. S. 94, 102 (1973); *United States* v. *National Dairy Products Corp.*, 372 U. S. 29, 32 (1963), and that we will decline to apply the statute only if the presumption of constitutionality can be overcome, see *Fullilove, supra*, at 473; *Columbia Broadcasting, supra*, at 103. That caution is not recited by the Court in the present case *because it does not apply*. Where a private citizen challenges action of the Government on grounds unrelated to separation of powers, harmonious functioning of the system demands that we ordinarily give some deference, or a presumption of validity, to the actions of the political branches in what is agreed, between themselves at least, to be within their respective spheres. But where the issue pertains to separation of pow-

ers, and the political branches are (as here) in disagreement, neither can be presumed correct. The reason is stated concisely by Madison: "The several departments being perfectly co-ordinate by the terms of their common commission, neither of them, it is evident, can pretend to an exclusive or superior right of settling the boundaries between their respective powers . . . ." Federalist No. 49, p. 314. The playing field for the present case, in other words, is a level one. As one of the interested and coordinate parties to the underlying constitutional dispute, Congress, no more than the President, is entitled to the benefit of the doubt.

To repeat, Article II, § 1, cl. 1, of the Constitution provides:

"The executive Power shall be vested in a President of the United States."

As I described at the outset of this opinion, this does not mean *some of* the executive power, but *all of* the executive power. It seems to me, therefore, that the decision of the Court of Appeals invalidating the present statute must be upheld on fundamental separation-of-powers principles if the following two questions are answered affirmatively: (1) Is the conduct of a criminal prosecution (and of an investigation to decide whether to prosecute) the exercise of purely executive power? (2) Does the statute deprive the President of the United States of exclusive control over the exercise of that power? Surprising to say, the Court appears to concede an affirmative answer to both questions, but seeks to avoid the inevitable conclusion that since the statute vests some purely executive power in a person who is not the President of the United States it is void.

The Court concedes that "[t]here is no real dispute that the functions performed by the independent counsel are 'executive'," though it qualifies that concession by adding "in the sense that they are law enforcement functions that typically have been undertaken by officials within the Executive Branch." *Ante*, at 691. The qualifier adds nothing but at-

mosphere. In what *other* sense can one identify "the executive Power" that is supposed to be vested in the President (unless it includes everything the Executive Branch is given to do) *except* by reference to what has always and everywhere—if conducted by government at all—been conducted never by the legislature, never by the courts, and always by the executive. There is no possible doubt that the independent counsel's functions fit this description. She is vested with the "full power and independent authority to exercise all *investigative and prosecutorial* functions and powers of the Department of Justice [and] the Attorney General." 28 U. S. C. § 594(a) (1982 ed., Supp. V) (emphasis added). Governmental investigation and prosecution of crimes is a quintessentially executive function. See *Heckler* v. *Chaney*, 470 U. S. 821, 832 (1985); *Buckley* v. *Valeo*, 424 U. S. 1, 138 (1976); *United States* v. *Nixon*, 418 U. S. 683, 693 (1974).

As for the second question, whether the statute before us deprives the President of exclusive control over that quintessentially executive activity: The Court does not, and could not possibly, assert that it does not. That is indeed the whole object of the statute. Instead, the Court points out that the President, through his Attorney General, has at least *some* control. That concession is alone enough to invalidate the statute, but I cannot refrain from pointing out that the Court greatly exaggerates the extent of that "some" Presidential control. "Most importan[t]" among these controls, the Court asserts, is the Attorney General's "power to remove the counsel for 'good cause.'" *Ante*, at 696. This is somewhat like referring to shackles as an effective means of locomotion. As we recognized in *Humphrey's Executor* v. *United States*, 295 U. S. 602 (1935)—indeed, what *Humphrey's Executor* was all about—limiting removal power to "good cause" is an impediment to, not an effective grant of, Presidential control. We said that limitation was necessary with respect to members of the Federal Trade Commission, which we found to be "an agency of the legislative and judicial

departments," and "wholly disconnected from the executive department," *id.*, at 630, because "it is quite evident that one who holds his office only during the pleasure of another, cannot be depended upon to maintain an attitude of independence against the latter's will." *Id.*, at 629. What we in *Humphrey's Executor* found to be a means of eliminating Presidential control, the Court today considers the "most importan[t]" means of assuring Presidential control. Congress, of course, operated under no such illusion when it enacted this statute, describing the "good cause" limitation as "protecting the independent counsel's ability to act independently of the President's direct control" since it permits removal only for "misconduct." H. R. Conf. Rep. 100–452, p. 37 (1987).

Moving on to the presumably "less important" controls that the President retains, the Court notes that no independent counsel may be appointed without a specific request from the Attorney General. As I have discussed above, the condition that renders such a request mandatory (inability to find "no reasonable grounds to believe" that further investigation is warranted) is so insubstantial that the Attorney General's discretion is severely confined. And once the referral is made, it is for the Special Division to determine the scope and duration of the investigation. See 28 U. S. C. § 593(b) (1982 ed., Supp. V). And in any event, the limited power over referral is irrelevant to the question whether, *once appointed*, the independent counsel exercises executive power free from the President's control. Finally, the Court points out that the Act directs the independent counsel to abide by general Justice Department policy, except when not "possible." See 28 U. S. C. § 594(f) (1982 ed., Supp. V). The exception alone shows this to be an empty promise. Even without that, however, one would be hard put to come up with many investigative or prosecutorial "policies" (other than those imposed by the Constitution or by Congress through law) that are absolute. Almost all investigative and prosecutorial deci-

sions—including the ultimate decision whether, after a technical violation of the law has been found, prosecution is warranted—involve the balancing of innumerable legal and practical considerations. Indeed, even political considerations (in the nonpartisan sense) must be considered, as exemplified by the recent decision of an independent counsel to subpoena the former Ambassador of Canada, producing considerable tension in our relations with that country. See N. Y. Times, May 29, 1987, p. A12, col. 1. Another preeminently political decision is whether getting a conviction in a particular case is worth the disclosure of national security information that would be necessary. The Justice Department and our intelligence agencies are often in disagreement on this point, and the Justice Department does not always win. The present Act even goes so far as specifically to take the resolution of that dispute away from the President and give it to the independent counsel. 28 U. S. C. § 594(a)(6) (1982 ed., Supp. V). In sum, the balancing of various legal, practical, and political considerations, none of which is absolute, is the very essence of prosecutorial discretion. To take this away is to remove the core of the prosecutorial function, and not merely "some" Presidential control.

As I have said, however, it is ultimately irrelevant *how much* the statute reduces Presidential control. The case is over when the Court acknowledges, as it must, that "[i]t is undeniable that the Act reduces the amount of control or supervision that the Attorney General and, through him, the President exercises over the investigation and prosecution of a certain class of alleged criminal activity." *Ante*, at 695. It effects a revolution in our constitutional jurisprudence for the Court, once it has determined that (1) purely executive functions are at issue here, and (2) those functions have been given to a person whose actions are not fully within the supervision and control of the President, nonetheless to proceed further to sit in judgment of whether "the President's need to control the exercise of [the independent counsel's]

discretion is *so central* to the functioning of the Executive Branch" as to require complete control, *ante*, at 691 (emphasis added), whether the conferral of his powers upon someone else "*sufficiently* deprives the President of control over the independent counsel to interfere impermissibly with [his] constitutional obligation to ensure the faithful execution of the laws," *ante*, at 693 (emphasis added), and whether "the Act give[s] the Executive Branch *sufficient* control over the independent counsel to ensure that the President is able to perform his constitutionally assigned duties," *ante*, at 696 (emphasis added). It is not for us to determine, and we have never presumed to determine, how much of the purely executive powers of government must be within the full control of the President. The Constitution prescribes that they *all* are.

The utter incompatibility of the Court's approach with our constitutional traditions can be made more clear, perhaps, by applying it to the powers of the other two branches. Is it conceivable that if Congress passed a statute depriving itself of less than full and entire control over some insignificant area of legislation, we would inquire whether the matter was "*so central* to the functioning of the Legislative Branch" as really to require complete control, or whether the statute gives Congress "*sufficient* control over the surrogate legislator to ensure that Congress is able to perform its constitutionally assigned duties"? Of course we would have none of that. Once we determined that a purely legislative power was at issue we would require it to be exercised, wholly and entirely, by Congress. Or to bring the point closer to home, consider a statute giving to non-Article III judges just a tiny bit of purely judicial power in a relatively insignificant field, with substantial control, though not total control, in the courts—perhaps "clear error" review, which would be a fair judicial equivalent of the Attorney General's "for cause" removal power here. Is there any doubt that we would not pause to inquire whether the matter was "*so central* to the

functioning of the Judicial Branch" as really to require complete control, or whether we retained *"sufficient* control over the matters to be decided that we are able to perform our constitutionally assigned duties"? We would say that our "constitutionally assigned duties" include *complete* control over all exercises of the judicial power—or, as the plurality opinion said in *Northern Pipeline Construction Co.* v. *Marathon Pipe Line Co.*, 458 U. S. 50, 58–59 (1982): "The inexorable command of [Article III] is clear and definite: The judicial power of the United States must be exercised by courts having the attributes prescribed in Art. III." We should say here that the President's constitutionally assigned duties include *complete* control over investigation and prosecution of violations of the law, and that the inexorable command of Article II is clear and definite: the executive power must be vested in the President of the United States.

Is it unthinkable that the President should have such exclusive power, even when alleged crimes by him or his close associates are at issue? No more so than that Congress should have the exclusive power of legislation, even when what is at issue is its own exemption from the burdens of certain laws. See Civil Rights Act of 1964, Title VII, 42 U. S. C. § 2000e *et seq.* (prohibiting "employers," not defined to include the United States, from discriminating on the basis of race, color, religion, sex, or national origin). No more so than that this Court should have the exclusive power to pronounce the final decision on justiciable cases and controversies, even those pertaining to the constitutionality of a statute reducing the salaries of the Justices. See *United States* v. *Will*, 449 U. S. 200, 211–217 (1980). A system of separate and coordinate powers necessarily involves an acceptance of exclusive power that can theoretically be abused. As we reiterate this very day, "[i]t is a truism that constitutional protections have costs." *Coy* v. *Iowa*, *post*, at 1020. While the separation of powers may prevent us from righting every wrong, it does so in order to ensure that we do not lose lib-

erty. The checks against any branch's abuse of its exclusive powers are twofold: First, retaliation by one of the other branch's use of *its* exclusive powers: Congress, for example, can impeach the executive who willfully fails to enforce the laws; the executive can decline to prosecute under unconstitutional statutes, cf. *United States* v. *Lovett*, 328 U. S. 303 (1946); and the courts can dismiss malicious prosecutions. Second, and ultimately, there is the political check that the people will replace those in the political branches (the branches more "dangerous to the political rights of the Constitution," Federalist No. 78, p. 465) who are guilty of abuse. Political pressures produced special prosecutors—for Teapot Dome and for Watergate, for example—long before this statute created the independent counsel. See Act of Feb. 8, 1924, ch. 16, 43 Stat. 5–6; 38 Fed. Reg. 30738 (1973).

The Court has, nonetheless, replaced the clear constitutional prescription that the executive power belongs to the President with a "balancing test." What are the standards to determine how the balance is to be struck, that is, how much removal of Presidential power is too much? Many countries of the world get along with an executive that is much weaker than ours—in fact, entirely dependent upon the continued support of the legislature. Once we depart from the text of the Constitution, just where short of that do we stop? The most amazing feature of the Court's opinion is that it does not even purport to give an answer. It simply *announces*, with no analysis, that the ability to control the decision whether to investigate and prosecute the President's closest advisers, and indeed the President himself, is not "so central to the functioning of the Executive Branch" as to be constitutionally required to be within the President's control. Apparently that is so because we say it is so. Having abandoned as the basis for our decisionmaking the text of Article II that "the executive Power" must be vested in the President, the Court does not even attempt to craft a *substitute* criterion—a "justiciable standard," see, *e. g., Baker* v. *Carr*,

369 U. S. 186, 210 (1962); *Coleman* v. *Miller*, 307 U. S. 433, 454–455 (1939), however remote from the Constitution—that today governs, and in the future will govern, the decision of such questions. Evidently, the governing standard is to be what might be called the unfettered wisdom of a majority of this Court, revealed to an obedient people on a case-by-case basis. This is not only not the government of laws that the Constitution established; it is not a government of laws at all.

In my view, moreover, even as an ad hoc, standardless judgment the Court's conclusion must be wrong. Before this statute was passed, the President, in taking action disagreeable to the Congress, or an executive officer giving advice to the President or testifying before Congress concerning one of those many matters on which the two branches are from time to time at odds, could be assured that his acts and motives would be adjudged—insofar as the decision whether to conduct a criminal investigation and to prosecute is concerned—in the Executive Branch, that is, in a forum attuned to the interests and the policies of the Presidency. That was one of the natural advantages the Constitution gave to the Presidency, just as it gave Members of Congress (and their staffs) the advantage of not being prosecutable for anything said or done in their legislative capacities. See U. S. Const., Art. I, § 6, cl. 1; *Gravel* v. *United States*, 408 U. S. 606 (1972). It is the very object of this legislation to eliminate that assurance of a sympathetic forum. Unless it can honestly be said that there are "no reasonable grounds to believe" that further investigation is warranted, further investigation must ensue; and the conduct of the investigation, and determination of whether to prosecute, will be given to a person neither selected by nor subject to the control of the President—who will in turn assemble a staff by finding out, presumably, who is willing to put aside whatever else they are doing, for an indeterminate period of time, in order to investigate and prosecute the President or a particular named individual in his administration. The prospect is frightening (as I will dis-

cuss at some greater length at the conclusion of this opinion) even outside the context of a bitter, interbranch political dispute. Perhaps the boldness of the President himself will not be affected—though I am not even sure of that. (How much easier it is for Congress, instead of accepting the political damage attendant to the commencement of impeachment proceedings against the President on trivial grounds—or, for that matter, how easy it is for one of the President's political foes outside of Congress—simply to trigger a debilitating criminal investigation of the Chief Executive under this law.) But as for the President's high-level assistants, who typically have no political base of support, it is as utterly unrealistic to think that they will not be intimidated by this prospect, and that their advice to him and their advocacy of his interests before a hostile Congress will not be affected, as it would be to think that the Members of Congress and their staffs would be unaffected by replacing the Speech or Debate Clause with a similar provision. It deeply wounds the President, by substantially reducing the President's ability to protect himself and his staff. That is the whole object of the law, of course, and I cannot imagine why the Court believes it does not succeed.

Besides weakening the Presidency by reducing the zeal of his staff, it must also be obvious that the institution of the independent counsel enfeebles him more directly in his constant confrontations with Congress, by eroding his public support. Nothing is so politically effective as the ability to charge that one's opponent and his associates are not merely wrongheaded, naive, ineffective, but, in all probability, "crooks." And nothing so effectively gives an appearance of validity to such charges as a Justice Department investigation and, even better, prosecution. The present statute provides ample means for that sort of attack, assuring that massive and lengthy investigations will occur, not merely when the Justice Department in the application of its usual standards believes they are called for, but whenever it

cannot be said that there are "no reasonable grounds to believe" they are called for. The statute's highly visible procedures assure, moreover, that unlike most investigations these will be widely known and prominently displayed. Thus, in the 10 years since the institution of the independent counsel was established by law, there have been nine highly publicized investigations, a source of constant political damage to two administrations. That they could not remotely be described as merely the application of "normal" investigatory and prosecutory standards is demonstrated by, in addition to the language of the statute ("no reasonable grounds to believe"), the following facts: Congress appropriates approximately $50 million annually for general legal activities, salaries, and expenses of the Criminal Division of the Department of Justice. See 1989 Budget Request of the Department of Justice, Hearings before a Subcommittee of the House Committee on Appropriations, 100th Cong., 2d Sess., pt. 6, pp. 284–285 (1988) (DOJ Budget Request). This money is used to support "[f]ederal appellate activity," "[o]rganized crime prosecution," "[p]ublic integrity" and "[f]raud" matters, "[n]arcotic & dangerous drug prosecution," "[i]nternal security," "[g]eneral litigation and legal advice," "special investigations," "[p]rosecution support," "[o]rganized crime drug enforcement," and "[m]anagement & administration." *Id.*, at 284. By comparison, between May 1986 and August 1987, four independent counsel (not all of whom were operating for that entire period of time) spent almost $5 million (one-tenth of the amount annually appropriated to the entire Criminal Division), spending almost $1 million in the month of August 1987 alone. See Washington Post, Oct. 21, 1987, p. A21, col. 5. For fiscal year 1989, the Department of Justice has requested $52 million for the entire Criminal Division, DOJ Budget Request 285, and $7 million to support the activities of independent counsel, *id.*, at 25.

In sum, this statute does deprive the President of substantial control over the prosecutory functions performed by the

independent counsel, and it does substantially affect the balance of powers. That the Court could possibly conclude otherwise demonstrates both the wisdom of our former constitutional system, in which the degree of reduced control and political impairment were irrelevant, since *all* purely executive power had to be in the President; and the folly of the new system of standardless judicial allocation of powers we adopt today.

## III

As I indicated earlier, the basic separation-of-powers principles I have discussed are what give life and content to our jurisprudence concerning the President's power to appoint and remove officers. The same result of unconstitutionality is therefore plainly indicated by our case law in these areas.

Article II, § 2, cl. 2, of the Constitution provides as follows:

> "[The President] shall nominate, and by and with the Advice and Consent of the the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."

Because appellant (who all parties and the Court agree is an officer of the United States, *ante,* at 671, n. 12) was not appointed by the President with the advice and consent of the Senate, but rather by the Special Division of the United States Court of Appeals, her appointment is constitutional only if (1) she is an "inferior" officer within the meaning of the above Clause, and (2) Congress may vest her appointment in a court of law.

As to the first of these inquiries, the Court does not attempt to "decide exactly" what establishes the line between

principal and "inferior" officers, but is confident that, whatever the line may be, appellant "clearly falls on the 'inferior officer' side" of it. *Ante*, at 671. The Court gives three reasons: *First*, she "is subject to removal by a higher Executive Branch official," namely, the Attorney General. *Ibid.* *Second*, she is "empowered by the Act to perform only certain, limited duties." *Ibid.* *Third*, her office is "limited in jurisdiction" and "limited in tenure." *Ante*, at 672.

The first of these lends no support to the view that appellant is an inferior officer. Appellant is removable only for "good cause" or physical or mental incapacity. 28 U. S. C. § 596(a)(1) (1982 ed., Supp. V). By contrast, most (if not all) *principal* officers in the Executive Branch may be removed by the President *at will*. I fail to see how the fact that appellant is more difficult to remove than most principal officers helps to establish that she is an inferior officer. And I do not see how it could possibly make any difference to her superior or inferior status that the President's limited power to remove her must be exercised through the Attorney General. If she were removable at will by the Attorney General, then she would be subordinate to him and thus properly designated as inferior; but the Court essentially admits that she is not subordinate. See *ante*, at 671. If it were common usage to refer to someone as "inferior" who is subject to removal for cause by another, then one would say that the President is "inferior" to Congress.

The second reason offered by the Court—that appellant performs only certain, limited duties—may be relevant to whether she is an inferior officer, but it mischaracterizes the extent of her powers. As the Court states: "Admittedly, the Act delegates to appellant [the] '*full power and independent authority to exercise all investigative and prosecutorial functions and powers of the Department of Justice.*'" *Ibid.*, quoting 28 U. S. C. § 594(a) (1982 ed., Supp. V) (emphasis

added).[2] Moreover, in addition to this general grant of power she is given a broad range of specifically enumerated powers, including a power not even the Attorney General possesses: to "contes[t] in court . . . any claim of privilege or attempt to withhold evidence on grounds of national security." § 594(a)(6).[3] Once all of this is "admitted," it seems

---

[2] The Court omits the further provision that the independent counsel exercises within her sphere the "full power" of *the Attorney General,* [with one minor exception relating to wiretap authorizations] and any other officer or employee of the Department of Justice[.]" § 594(a). This is, of course, quite difficult to square with the Court's assertion that appellant is "'inferior' in rank and authority" to the Attorney General. *Ante,* at 671.

[3] The independent counsel's specifically enumerated powers include the following:

"(1) conducting proceedings before grand juries and other investigations;

"(2) participating in court proceedings and engaging in any litigation, including civil and criminal matters, that [the] independent counsel deems necessary;

"(3) appealing any decision of a court in any case or proceeding in which [the] independent counsel participates in an official capacity;

"(4) reviewing all documentary evidence available from any source;

"(5) determining whether to contest the assertion of any testimonial privilege;

"(6) receiving appropriate national security clearances and, if necessary contesting in court . . . any claim of privilege or attempt to withhold evidence on grounds of national security;

"(7) making applications to any Federal court for a grant of immunity to any witness . . . or for warrants, subpoenas, or other court orders, and for purposes of sections 6003, 6004, and 6005 of title 18, exercising the authority vested in a United States attorney or the Attorney General;

"(8) inspecting, obtaining, or using the original or a copy of any tax return . . . ;

"(9) initiating and conducting prosecutions in any court of competent jurisdiction, framing and signing indictments, filing informations, and handling all aspects of any case filed in the name of the United States; and

"(10) consulting with the United States Attorney for the district in which the violation was alleged to have occurred." §§ 594(a)(1)–(10).

In addition, the statute empowers the independent counsel to hire a staff of a size as large as she "deems necessary," § 594(c), and to enlist and re-

to me impossible to maintain that appellant's authority is so "limited" as to render her an inferior officer. The Court seeks to brush this away by asserting that the independent counsel's power does not include any authority to "formulate policy for the Government or the Executive Branch." *Ante,* at 671. But the same could be said for all officers of the Government, with the single exception of the President. All of them only formulate policy within their respective spheres of responsibility—as does the independent counsel, who must comply with the policies of the Department of Justice only to the extent possible. § 594(f).

The final set of reasons given by the Court for why the independent counsel clearly is an inferior officer emphasizes the limited nature of her jurisdiction and tenure. Taking the latter first, I find nothing unusually limited about the independent counsel's tenure. To the contrary, unlike most high ranking Executive Branch officials, she continues to serve until she (or the Special Division) decides that her work is substantially completed. See §§ 596(b)(1), (b)(2). This particular independent prosecutor has already served more than two years, which is at least as long as many Cabinet officials. As to the scope of her jurisdiction, there can be no doubt that is small (though far from unimportant). But within it she exercises more than the full power of the Attorney General. The Ambassador to Luxembourg is not anything less than a principal officer, simply because Luxembourg is small. And the federal judge who sits in a small district is not for that reason "inferior in rank and authority." If the mere fragmentation of executive responsibilities into small compartments suffices to render the heads of each of those compartments inferior officers, then Congress could deprive the President of the right to appoint his chief law enforcement officer by dividing up the Attorney General's responsibilities among a number of "lesser" functionaries.

---

ceive "where necessary to perform [her] duties" the assistance, personnel and resources of the Department of Justice, § 594(d).

More fundamentally, however, it is not clear from the Court's opinion why the factors it discusses — even if applied correctly to the facts of this case — are determinative of the question of inferior officer status. The apparent source of these factors is a statement in *United States* v. *Germaine*, 99 U. S. 508, 511 (1879) (discussing *United States* v. *Hartwell*, 6 Wall. 385, 393 (1868)), that "the term [officer] embraces the ideas of tenure, duration, emolument, and duties." See *ante*, at 672. Besides the fact that this was dictum, it was dictum in a case where the distinguishing characteristics of inferior officers versus superior officers were in no way relevant, but rather only the distinguishing characteristics of an "officer of the United States" (to which the criminal statute at issue applied) as opposed to a mere *employee*. Rather than erect a theory of who is an inferior officer on the foundation of such an irrelevancy, I think it preferable to look to the text of the Constitution and the division of power that it establishes. These demonstrate, I think, that the independent counsel is not an inferior officer because she is not *subordinate* to any officer in the Executive Branch (indeed, not even to the President). Dictionaries in use at the time of the Constitutional Convention gave the word "inferiour" two meanings which it still bears today: (1) "[l]ower in place, . . . station, . . . rank of life, . . . value or excellency," and (2) "[s]ubordinate." S. Johnson, Dictionary of the English Language (6th ed. 1785). In a document dealing with the structure (the constitution) of a government, one would naturally expect the word to bear the latter meaning — indeed, in such a context it would be unpardonably careless to use the word *unless* a relationship of subordination was intended. If what was meant was merely "lower in station or rank," one would use instead a term such as "lesser officers." At the only other point in the Constitution at which the word "inferior" appears, it plainly connotes a relationship of subordination. Article III vests the judicial power of the United States in "one supreme Court, and in such *inferior* Courts as

the Congress may from time to time ordain and establish."
U. S. Const., Art. III, § 1 (emphasis added). In Federalist
No. 81, Hamilton pauses to describe the "inferior" courts
authorized by Article III as inferior in the sense that they
are "subordinate" to the Supreme Court. See *id.*, at 485, n.,
490, n.

That "inferior" means "subordinate" is also consistent with
what little we know about the evolution of the Appoint-
ments Clause. As originally reported to the Committee on
Style, the Appointments Clause provided no "exception"
from the standard manner of appointment (President with
the advice and consent of the Senate) for inferior officers. 2
M. Farrand, Records of the Federal Convention of 1787,
pp. 498–499, 599 (rev. ed. 1966). On September 15, 1787,
the last day of the Convention before the proposed Constitu-
tion was signed, in the midst of a host of minor changes that
were being considered, Gouverneur Morris moved to add the
exceptions clause. *Id.*, at 627. No great debate ensued; the
only disagreement was over whether it was necessary at all.
*Id.*, at 627–628. Nobody thought that it was a fundamental
change, excluding from the President's appointment power
and the Senate's confirmation power a category of officers
who might function on their own, outside the supervision of
those appointed in the more cumbersome fashion. And it is
significant that in the very brief discussion Madison mentions
(as in apparent contrast to the "inferior officers" covered by
the provision) "Superior Officers." *Id.*, at 637. Of course
one is not a "superior officer" without some supervisory
responsibility, just as, I suggest, one is not an "inferior offi-
cer" within the meaning of the provision under discussion un-
less one is subject to supervision by a "superior officer." It
is perfectly obvious, therefore, both from the relative brevity
of the discussion this addition received, and from the content
of that discussion, that it was intended merely to make clear
(what Madison thought already was clear, see *id.*, at 627)
that those officers appointed by the President with Senate

approval could on their own appoint their subordinates, who would, of course, by chain of command still be under the direct control of the President.

This interpretation is, moreover, consistent with our admittedly sketchy precedent in this area. For example, in *United States* v. *Eaton*, 169 U. S. 331 (1898), we held that the appointment by an Executive Branch official other than the President of a "vice-consul," charged with the duty of temporarily performing the function of the consul, did not violate the Appointments Clause. In doing so, we repeatedly referred to the "vice-consul" as a "subordinate" officer. *Id.*, at 343. See also *United States* v. *Germaine, supra*, at 511 (comparing "inferior" commissioners and bureau officers to heads of department, describing the former as "mere . . . subordinates") (dicta); *United States* v. *Hartwell, supra*, at 394 (describing clerk appointed by Assistant Treasurer with approval of Secretary of the Treasury as a "subordinate office[r]") (dicta). More recently, in *United States* v. *Nixon*, 418 U. S. 683 (1974), we noted that the Attorney General's appointment of the Watergate Special Prosecutor was made pursuant to the Attorney General's "power to appoint *subordinate officers* to assist him in the discharge of his duties." *Id.*, at 694 (emphasis added). The Court's citation of *Nixon* as support for its view that the independent counsel is an inferior officer is simply not supported by a reading of the case. We explicitly stated that the Special Prosecutor was a "subordinate office[r]," *ibid.*, because, in the end, the President or the Attorney General could have removed him at any time, if by no other means than amending or revoking the regulation defining his authority. *Id.*, at 696. Nor are any of the other cases cited by the Court in support of its view inconsistent with the natural reading that an inferior officer must at least be subordinate to another officer of the United States. In *Ex parte Siebold*, 100 U. S. 371 (1880), we upheld the appointment by a court of federal "Judges of Election," who were charged with various duties involving the oversee-

ing of local congressional elections. Contrary to the Court's assertion, see *ante*, at 673, we did not specifically find that these officials were inferior officers for purposes of the Appointments Clause, probably because no one had contended that they were principal officers. Nor can the case be said to represent even an assumption on our part that they were inferior without being subordinate. The power of assisting in the judging of elections that they were exercising was assuredly not a purely executive power, and if we entertained any assumption it was probably that they, like the marshals who assisted them, see *Siebold*, 100 U. S., at 380, were subordinate to the courts, see *id.*, at 397. Similarly, in *Go-Bart Importing Co.* v. *United States*, 282 U. S. 344 (1931), where we held that United States commissioners were inferior officers, we made plain that they were subordinate to the district courts which appointed them: "The commissioner acted not as a court, or as a judge of any court, but as a mere officer of the district court in proceedings of which that court had authority to take control at any time." *Id.*, at 354.

To be sure, it is not a *sufficient* condition for "inferior" officer status that one be subordinate to a principal officer. Even an officer who is subordinate to a department head can be a principal officer. That is clear from the brief exchange following Gouverneur Morris' suggestion of the addition of the exceptions clause for inferior officers. Madison responded:

"It does not go far enough if it be necessary at all—*Superior Officers below Heads of Departments* ought in some cases to have the appointment of the lesser offices." 2 M. Farrand, Records of the Federal Convention, of 1787, p. 627 (rev. ed. 1966) (emphasis added).

But it is surely a *necessary* condition for inferior officer status that the officer be subordinate to another officer.

The independent counsel is not even subordinate to the President. The Court essentially admits as much, noting that "appellant may not be 'subordinate' to the Attorney Gen-

eral (and the President) insofar as she possesses a degree of independent discretion to exercise the powers delegated to her under the Act." *Ante,* at 671.   In fact, there is no doubt about it.   As noted earlier, the Act specifically grants her the *"full* power and *independent* authority to exercise *all* investigative and prosecutorial functions of the Department of Justice," 28 U. S. C. § 594(a) (1982 ed., Supp. V), and makes her removable only for "good cause," a limitation specifically intended to ensure that she be *independent* of, not *subordinate* to, the President and the Attorney General.   See H. R. Conf. Rep. No. 100–452, p. 37 (1987).

Because appellant is not subordinate to another officer, she is not an "inferior" officer and her appointment other than by the President with the advice and consent of the Senate is unconstitutional.

## IV

I will not discuss at any length why the restrictions upon the removal of the independent counsel also violate our established precedent dealing with that specific subject.   For most of it, I simply refer the reader to the scholarly opinion of Judge Silberman for the Court of Appeals below.   See *In re Sealed Case,* 267 U. S. App. D. C. 178, 838 F. 2d 476 (1988).   I cannot avoid commenting, however, about the essence of what the Court has done to our removal jurisprudence today.

There is, of course, no provision in the Constitution stating who may remove executive officers, except the provisions for removal by impeachment.   Before the present decision it was established, however, (1) that the President's power to remove principal officers who exercise purely executive powers could not be restricted, see *Myers* v. *United States,* 272 U. S. 52, 127 (1926), and (2) that his power to remove inferior officers who exercise purely executive powers, and whose appointment Congress had removed from the usual procedure of Presidential appointment with Senate consent, could be restricted, at least where the appointment had been made by

an officer of the Executive Branch, see *ibid.; United States* v. *Perkins*, 116 U. S. 483, 485 (1886).[1]

The Court could have resolved the removal power issue in this case by simply relying upon its erroneous conclusion that the independent counsel was an inferior officer, and then extending our holding that the removal of inferior officers appointed by the Executive can be restricted, to a new holding that even the removal of inferior officers appointed by the courts can be restricted. That would in my view be a considerable and unjustified extension, giving the Executive full discretion in *neither* the selection *nor* the removal of a purely executive officer. The course the Court has chosen, however, is even worse.

Since our 1935 decision in *Humphrey's Executor* v. *United States*, 295 U. S. 602—which was considered by many at the time the product of an activist, anti-New Deal Court bent on reducing the power of President Franklin Roosevelt—it has been established that the line of permissible restriction upon removal of principal officers lies at the point at which the powers exercised by those officers are no longer purely executive. Thus, removal restrictions have been generally regarded as lawful for so-called "independent regulatory

[1] The Court misunderstands my opinion to say that "every officer of the United States exercising any part of [the executive] power must serve at the pleasure of the President and be removable by him at will." *Ante*, at 690, n. 29. Of course, as my discussion here demonstrates, that has never been the law and I do not assert otherwise. What I *do* assert—and what the Constitution seems plainly to prescribe—is that the President must have control over all exercises of the executive power. See *supra*, at 705. That requires that he have plenary power to remove principal officers such as the independent counsel, but it does not require that he have plenary power to remove inferior officers. Since the latter are, as I have described, subordinate to, *i. e.*, subject to the supervision of, principal officers who (being removable at will) have the President's complete confidence, it is enough—at least if they have been appointed by the President or by a principal officer—that they be removable *for cause*, which would include, of course, the failure to accept supervision. Thus, *Perkins* is in no way inconsistent with my views.

agencies," such as the Federal Trade Commission, see *ibid.;* 15 U. S. C. § 41, the Interstate Commerce Commission, see 49 U. S. C. § 10301(c) (1982 ed., Supp. IV), and the Consumer Product Safety Commission, see 15 U. S. C. § 2053(a), which engage substantially in what has been called the "quasi-legislative activity" of rulemaking, and for members of Article I courts, such as the Court of Military Appeals, see 10 U. S. C. § 867(a)(2), who engage in the "quasi-judicial" function of adjudication. It has often been observed, correctly in my view, that the line between "purely executive" functions and "quasi-legislative" or "quasi-judicial" functions is not a clear one or even a rational one. See *ante,* at 689–691; *Bowsher* v. *Synar,* 478 U. S. 714, 761, n. 3 (1986) (WHITE, J., dissenting); *FTC* v. *Ruberoid Co.,* 343 U. S. 470, 487–488 (1952) (Jackson, J., dissenting). But at least it permitted the identification of certain officers, and certain agencies, whose functions were entirely within the control of the President. Congress had to be aware of that restriction in its legislation. Today, however, *Humphrey's Executor* is swept into the dustbin of repudiated constitutional principles. "[O]ur present considered view," the Court says, "is that the determination of whether the Constitution allows Congress to impose a 'good cause'-type restriction on the President's power to remove an official cannot be made to turn on whether or not that official is classified as 'purely executive.'" *Ante,* at 689. What *Humphrey's Executor* (and presumably *Myers*) really means, we are now told, is not that there are any "rigid categories of those officials who may or may not be removed at will by the President," but simply that Congress cannot "interefere with the President's exercise of the 'executive power' and his constitutionally appointed duty to 'take care that the laws be faithfully executed,'" *ante,* at 689–690.

One can hardly grieve for the shoddy treatment given today to *Humphrey's Executor,* which, after all, accorded the same indignity (with much less justification) to Chief Justice

Taft's opinion 10 years earlier in *Myers* v. *United States*, 272 U. S. 52 (1926)—gutting, in six quick pages devoid of textual or historical precedent for the novel principle it set forth, a carefully researched and reasoned 70-page opinion. It is in fact comforting to witness the reality that he who lives by the *ipse dixit* dies by the *ipse dixit*. But one must grieve for the Constitution. *Humphrey's Executor* at least had the decency formally to observe the constitutional principle that the President had to be the repository of *all* executive power, see 295 U. S., at 627–628, which, as *Myers* carefully explained, necessarily means that he must be able to discharge those who do not perform executive functions according to his liking. As we noted in *Bowsher*, once an officer is appointed " 'it is only the authority that can remove him, and not the authority that appointed him, that he must fear and, in the performance of his functions, obey.' " 478 U. S., at 726, quoting *Synar* v. *United States*, 626 F. Supp. 1374, 1401 (DC 1986) (Scalia, Johnson, and Gasch, JJ.). By contrast, "our present considered view" is simply that *any* executive officer's removal can be restricted, so long as the President remains "able to accomplish his constitutional role." *Ante*, at 690. There are now no lines. If the removal of a prosecutor, the virtual embodiment of the power to "take care that the laws be faithfully executed," can be restricted, what officer's removal cannot? This is an open invitation for Congress to experiment. What about a special Assistant Secretary of State, with responsibility for one very narrow area of foreign policy, who would not only have to be confirmed by the Senate but could also be removed only pursuant to certain carefully designed restrictions? Could this possibly render the President "[un]able to accomplish his constitutional role"? Or a special Assistant Secretary of Defense for Procurement? The possibilities are endless, and the Court does not understand what the separation of powers, what "[a]mbition . . . counteract[ing] ambition," Federalist No. 51, p. 322 (Madison), is all about, if it does not expect Congress to try them. As far as I can discern from the Court's opinion, it is now

open season upon the President's removal power for all executive officers, with not even the superficially principled restriction of *Humphrey's Executor* as cover. The Court essentially says to the President: "Trust us. We will make sure that you are able to accomplish your constitutional role." I think the Constitution gives the President—and the people—more protection than that.

## V

The purpose of the separation and equilibration of powers in general, and of the unitary Executive in particular, was not merely to assure effective government but to preserve individual freedom. Those who hold or have held offices covered by the Ethics in Government Act are entitled to that protection as much as the rest of us, and I conclude my discussion by considering the effect of the Act upon the fairness of the process they receive.

Only someone who has worked in the field of law enforcement can fully appreciate the vast power and the immense discretion that are placed in the hands of a prosecutor with respect to the objects of his investigation. Justice Robert Jackson, when he was Attorney General under President Franklin Roosevelt, described it in a memorable speech to United States Attorneys, as follows:

> "There is a most important reason why the prosecutor should have, as nearly as possible, a detached and impartial view of all groups in his community. Law enforcement is not automatic. It isn't blind. One of the greatest difficulties of the position of prosecutor is that he must pick his cases, because no prosecutor can even investigate all of the cases in which he receives complaints. If the Department of Justice were to make even a pretense of reaching every probable violation of federal law, ten times its present staff will be inadequate. We know that no local police force can strictly enforce the traffic laws, or it would arrest half the driving population on

any given morning. What every prosecutor is practically required to do is to select the cases for prosecution and to select those in which the offense is the most flagrant, the public harm the greatest, and the proof the most certain.

"If the prosecutor is obliged to choose his case, it follows that he can choose his defendants. Therein is the most dangerous power of the prosecutor: that he will pick people that he thinks he should get, rather than cases that need to be prosecuted. With the law books filled with a great assortment of crimes, a prosecutor stands a fair chance of finding at least a technical violation of some act on the part of almost anyone. In such a case, it is not a question of discovering the commission of a crime and then looking for the man who has committed it, it is a question of picking the man and then searching the law books, or putting investigators to work, to pin some offense on him. It is in this realm—in which the prosecutor picks some person whom he dislikes or desires to embarrass, or selects some group of unpopular persons and then looks for an offense, that the greatest danger of abuse of prosecuting power lies. It is here that law enforcement becomes personal, and the real crime becomes that of being unpopular with the predominant or governing group, being attached to the wrong political views, or being personally obnoxious to or in the way of the prosecutor himself." R. Jackson, The Federal Prosecutor, Address Delivered at the Second Annual Conference of United States Attorneys, April 1, 1940.

Under our system of government, the primary check against prosecutorial abuse is a political one. The prosecutors who exercise this awesome discretion are selected and can be removed by a President, whom the people have trusted enough to elect. Moreover, when crimes are not investigated and prosecuted fairly, nonselectively, with a rea-

sonable sense of proportion, the President pays the cost in political damage to his administration.   If federal prosecutors "pick people that [they] thin[k] [they] should get, rather than cases that need to be prosecuted," if they amass many more resources against a particular prominent individual, or against a particular class of political protesters, or against members of a particular political party, than the gravity of the alleged offenses or the record of successful prosecutions seems to warrant, the unfairness will come home to roost in the Oval Office.   I leave it to the reader to recall the examples of this in recent years.   That result, of course, was precisely what the Founders had in mind when they provided that all executive powers would be exercised by a *single* Chief Executive.   As Hamilton put it, "[t]he ingredients which constitute safety in the republican sense are a due dependence on the people, and a due responsibility."   Federalist No. 70, p. 424.   The President is directly dependent on the people, and since there is only *one* President, *he* is responsible.   The people know whom to blame, whereas "one of the weightiest objections to a plurality in the executive . . . is that it tends to conceal faults and destroy responsibility."   *Id.*, at 427.

That is the system of justice the rest of us are entitled to, but what of that select class consisting of present or former high-level Executive Branch officials?   If an allegation is made against them of any violation of any federal criminal law (except Class B or C misdemeanors or infractions) the Attorney General must give it his attention.   That in itself is not objectionable.   But if, after a 90-day investigation without the benefit of normal investigatory tools, the Attorney General is unable to say that there are "no reasonable grounds to believe" that further investigation is warranted, a process is set in motion that is *not* in the full control of persons "dependent on the people," and whose flaws cannot be blamed on the President.   An independent counsel is selected, and the scope of his or her authority prescribed, by a

panel of judges. What if they are politically partisan, as judges have been known to be, and select a prosecutor antagonistic to the administration, or even to the particular individual who has been selected for this special treatment? There is no remedy for that, not even a political one. Judges, after all, have life tenure, and appointing a surefire enthusiastic prosecutor could hardly be considered an impeachable offense. So if there is anything wrong with the selection, there is effectively no one to blame. The independent counsel thus selected proceeds to assemble a staff. As I observed earlier, in the nature of things this has to be done by finding lawyers who are willing to lay aside their current careers for an indeterminate amount of time, to take on a job that has no prospect of permanence and little prospect for promotion. One thing is certain, however: it involves investigating and perhaps prosecuting a particular individual. Can one imagine a less equitable manner of fulfilling the executive responsibility to investigate and prosecute? What would be the reaction if, in an area not covered by this statute, the Justice Department posted a public notice inviting applicants to assist in an investigation and possible prosecution of a certain prominent person? Does this not invite what Justice Jackson described as "picking the man and then searching the law books, or putting investigators to work, to pin some offense on him"? To be sure, the investigation must relate to the area of criminal offense specified by the life-tenured judges. But that has often been (and nothing prevents it from being) very broad—and should the independent counsel or his or her staff come up with something beyond that scope, nothing prevents him or her from asking the judges to expand his or her authority or, if that does not work, referring it to the Attorney General, whereupon the whole process would recommence and, if there was "reasonable basis to believe" that further investigation was warranted, that new offense would be referred to the Special Division, which would in all likelihood assign it to the same

independent counsel.   It seems to me not conducive to fair-
ness.   But even if it were entirely evident that unfairness
was in fact the result—the judges hostile to the administra-
tion, the independent counsel an old foe of the President, the
staff refugees from the recently defeated administration—
*there would be no one accountable to the public to whom the
blame could be assigned.*

I do not mean to suggest that anything of this sort (other
than the inevitable self-selection of the prosecutory staff)
occurred in the present case.   I know and have the highest
regard for the judges on the Special Division, and the
independent counsel herself is a woman of accomplishment,
impartiality, and integrity.   But the fairness of a process
must be adjudged on the basis of what it permits to happen,
not what it produced in a particular case.   It is true, of
course, that a similar list of horribles could be attributed to
an ordinary Justice Department prosecution—a vindictive
prosecutor, an antagonistic staff, etc.   But the difference is
the difference that the Founders envisioned when they estab-
lished a single Chief Executive accountable to the people: the
blame can be assigned to someone who can be punished.

The above described possibilities of irresponsible conduct
must, as I say, be considered in judging the constitutional
acceptability of this process.   But they will rarely occur, and
in the average case the threat to fairness is quite different.
As described in the brief filed on behalf of three ex-Attorneys
General from each of the last three administrations:

> "The problem is less spectacular but much more worri-
> some.   It is that the institutional environment of the In-
> dependent Counsel—specifically, her isolation from the
> Executive Branch and the internal checks and balances it
> supplies—is designed to heighten, not to check, all of the
> occupational hazards of the dedicated prosecutor; the
> danger of too narrow a focus, of the loss of perspective,
> of preoccupation with the pursuit of one alleged suspect
> to the exclusion of other interests."   Brief for Edward

H. Levi, Griffin B. Bell, and William French Smith as *Amici Curiae* 11.

It is, in other words, an additional advantage of the unitary Executive that it can achieve a more uniform application of the law. Perhaps that is not always achieved, but the mechanism to achieve it is there. The mini-Executive that is the independent counsel, however, operating in an area where so little is law and so much is discretion, is intentionally cut off from the unifying influence of the Justice Department, and from the perspective that multiple responsibilities provide. What would normally be regarded as a technical violation (there are no rules defining such things), may in his or her small world assume the proportions of an indictable offense. What would normally be regarded as an investigation that has reached the level of pursuing such picayune matters that it should be concluded, may to him or her be an investigation that ought to go on for another year. How frightening it must be to have your own independent counsel and staff appointed, with nothing else to do but to investigate you until investigation is no longer worthwhile—with whether it is worthwhile not depending upon what such judgments usually hinge on, competing responsibilities. And to have that counsel and staff decide, with no basis for comparison, whether what you have done is bad enough, willful enough, and provable enough, to warrant an indictment. How admirable the constitutional system that provides the means to avoid such a distortion. And how unfortunate the judicial decision that has permitted it.

\*     \*     \*

The notion that every violation of law should be prosecuted, including—indeed, *especially*—every violation by those in high places, is an attractive one, and it would be risky to argue in an election campaign that that is not an absolutely overriding value. *Fiat justitia, ruat coelum.* Let justice be done, though the heavens may fall. The reality is, however, that it is not an absolutely overriding value, and it

was with the hope that we would be able to acknowledge and apply such realities that the Constitution spared us, by life tenure, the necessity of election campaigns. I cannot imagine that there are not many thoughtful men and women in Congress who realize that the benefits of this legislation are far outweighed by its harmful effect upon our system of government, and even upon the nature of justice received by those men and women who agree to serve in the Executive Branch. But it is difficult to vote not to enact, and even more difficult to vote to repeal, a statute called, appropriately enough, the Ethics in Government Act. If Congress is controlled by the party other than the one to which the President belongs, it has little incentive to repeal it; if it is controlled by the same party, it dare not. By its shortsighted action today, I fear the Court has permanently encumbered the Republic with an institution that will do it great harm.

Worse than what it has done, however, is the manner in which it has done it. A government of laws means a government of rules. Today's decision on the basic issue of fragmentation of executive power is ungoverned by rule, and hence ungoverned by law. It extends into the very heart of our most significant constitutional function the "totality of the circumstances" mode of analysis that this Court has in recent years become fond of. Taking all things into account, we conclude that the power taken away from the President here is not really *too* much. The next time executive power is assigned to someone other than the President we may conclude, taking all things into account, that it *is* too much. That opinion, like this one, will not be confined by any rule. We will describe, as we have today (though I hope more accurately) the effects of the provision in question, and will authoritatively announce: "The President's need to control the exercise of the [subject officer's] discretion *is* so central to the functioning of the Executive Branch as to require complete control." This is not analysis; it is ad hoc judgment. And it fails to explain why it is not true that — as the text of

the Constitution seems to require, as the Founders seemed to expect, and as our past cases have uniformly assumed—all purely executive power must be under the control of the President.

The ad hoc approach to constitutional adjudication has real attraction, even apart from its work-saving potential. It is guaranteed to produce a result, in every case, that will make a majority of the Court happy with the law. The law is, by definition, precisely what the majority thinks, taking all things into account, it *ought* to be. I prefer to rely upon the judgment of the wise men who constructed our system, and of the people who approved it, and of two centuries of history that have shown it to be sound. Like it or not, that judgment says, quite plainly, that "[t]he executive Power shall be vested in a President of the United States."